**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ROBERTSHAW US HOLDING CORP., *et al.*, | : | Case No. 24-90052 (CML) |
| | : | |
| Debtors.[1] | : | (Joint Administration Requested) |
| | : | |
| | : | |
| ROBERTSHAW US HOLDING CORP., BAIN CAPITAL CREDIT, LP.; CANYON CAPITAL ADVISORS LLC; EATON VANCE MANAGEMENT; and ONE ROCK CAPITAL PARTNERS, LLC, | : | Adversary Proc. No. 24-_____ (___) |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| INVESCO SENIOR SECURED MANAGEMENT INC.; INVESCO FLOATING RATE INCOME FUND; DIVERSIFIED CREDIT PORTFOLIO LTD.; INVESCO DYNAMIC CREDIT OPPORTUNITY FUND; INVESCO FLOATING RATE ESG FUND; INVESCO CREDIT PARTNERS MASTER FUND II, LP; INVESCO CREDIT PARTNERS OPPORTUNITIES FUND 2020, L.P.; INVESCO PRIVATE CREDIT OPPORTUNITIES HOLDCO, LLC; KAPITALFORENINGEN INVESTIN PRO, US LEVERAGED LOANS; INVESCO MASTER LOAN FUND; MILTON HERSHEY SCHOOL TRUST; INVESCO SENIOR FLOATING RATE FUND; INVESCO SENIOR INCOME TRUST; INVESCO SENIOR LOAN FUND; SENTRY INSURANCE A MUTUAL COMPANY; INVESCO SSL FUND LLC; INVESCO TETON FUND LLC; INVESCO ZODIAC FUNDS - INVESCO US SENIOR LOAN ESG FUND; INVESCO ZODIAC FUNDS - INVESCO EUROPEAN SENIOR LOAN ESG FUND; INVESCO ZODIAC FUNDS - INVESCO EUROPEAN SENIOR LOAN FUND; INVESCO ZODIAC FUNDS - INVESCO US SENIOR | : | |

LOAN FUND; ALINEA CLO, LTD; ANNISA       :
CLO, LTD.; BETONY CLO 2, LTD.; CARBONE    :
CLO, LTD.; MILOS CLO, LTD.; RECETTE CLO,  :
LTD.; RISERVA CLO LTD.; UPLAND CLO,       :
LTD.; VERDE CLO, LTD.;                    :
KAPITALFORENINGEN INVESTIN PRO, and :
US LEVERAGED LOANS I,                     :
                                          :
         Defendants.                      :

---

[1]   The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are as follows:  Range Parent, Inc. (7956); Robertshaw US Holding Corp. (1898); Robertshaw Controls Company (9531); Burner Systems International, Inc. (8603); Robertshaw Mexican Holdings LLC (9531); Controles Temex Holdings LLC (9531); Universal Tubular Systems, LLC (8603); and Robertshaw Europe Holdings LLC (8843). The primary mailing address used for each of the foregoing debtors is 1222 Hamilton Parkway, Itasca, Illinois 60143.

## COMPLAINT

Robertshaw US Holding Corp. ("**Robertshaw**," or the "**Company**,") Bain Capital Credit, LP on behalf of certain of its managed funds ("**Bain Capital**"), Canyon Capital Advisors LLC on behalf of certain of its managed funds ("**Canyon Capital**"), Eaton Vance Management on behalf of certain of its managed funds ("**Eaton Vance**," and together with Bain Capital and Canyon Capital, the "**Lender Plaintiffs**"), and One Rock Capital Partners, LLC on behalf of certain of its managed funds ("**One Rock**," and together with Robertshaw and the Lender Plaintiffs, "**Plaintiffs**") file this adversary complaint (the "**Complaint**") pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") against Defendants Invesco Senior Secured Management, Inc. ("**Invesco**"); Invesco Floating Rate Income Fund; Diversified Credit Portfolio Ltd.; Invesco Dynamic Credit Opportunity Fund; Invesco Floating Rate ESG Fund; Invesco Credit Partners Master Fund II, LP; Invesco Credit Partners Opportunities Fund 2020, L.P.; Invesco Private Credit Opportunities Holdco, LLC; Kapitalforeningen Investin Pro, US Leveraged Loans; Invesco Master Loan Fund; Milton Hershey School Trust; Invesco Senior Floating Rate Fund; Invesco Senior Income Trust; Invesco Senior Loan Fund; Sentry Insurance a Mutual Company; Invesco SSL Fund LLC; Invesco Teton Fund LLC; Invesco Zodiac Funds - Invesco US Senior Loan ESG Fund; Invesco Zodiac Funds - Invesco European Senior Loan ESG Fund; Invesco Zodiac Funds - Invesco European Senior Loan Fund; Invesco Zodiac Funds - Invesco US Senior Loan Fund; Alinea CLO, Ltd; Annisa CLO, Ltd.; Betony CLO 2, Ltd.; Carbone CLO, Ltd.; Milos CLO, Ltd.; Recette CLO, Ltd.; Riserva CLO Ltd.; Upland CLO, Ltd.; Verde CLO, Ltd.; and Kapitalforeningen Investin Pro, US Leveraged Loans I (collectively, the "**Invesco Funds,**" and together with Invesco, the "**Defendants**").  As the basis for the Complaint, Plaintiffs state as follows:

1

## NATURE OF THE ACTION

1.      This adversary proceeding seeks a declaration that a series of transactions that Robertshaw executed in December 2023 to address liquidity constraints and give the Company additional runway to implement its turnaround plan (the "**December 2023 Transactions**") are valid under the relevant credit agreement.

2.      By way of background, in 2018, Robertshaw entered into two credit agreements to help fund its sale to a new equity sponsor.  Under these Original Credit Agreements, Robertshaw issued approximately $620 million in new secured debt in two tranches of secured loans to lenders, including the Invesco Funds.

3.      From 2018 through 2020, Robertshaw's business remained in good financial health.  However, things began to take a turn for the worse as the effects of the COVID-19 pandemic disrupted its operations and spiked inflation.  In 2022, Robertshaw's sales declined significantly, causing a liquidity crisis that forced it back into the lending market.  Robertshaw canvassed the market for potential new money deals and considered several alternatives.  Ultimately, the Company concluded that additional financing from its existing lenders was its best path forward.

4.      In 2023, Robertshaw negotiated a transaction with various lenders under the Original Credit Agreements—including the Invesco Defendants and the Lender Plaintiffs—by which the parties would amend the Original Credit Agreements to authorize Robertshaw to enter into a new Super-Priority Credit Agreement (the "**SPCA**").  The SPCA provided Robertshaw with $95 million in new money to fund its operations and pay down certain of its other existing funded debt obligations, and allowed participating lenders to sell their existing First- and Second-Lien Loans under the Original Credit Agreements to Robertshaw in exchange for "Second-Out," "Third-Out," "Fourth-Out," and "Fifth-Out" loans issued under the new Agreement (the "**May 2023 Transactions**").  In order to amend the terms of the SPCA, Robertshaw needed the consent

of "Required Lenders," which was defined to mean "at any time, Lenders having Loans representing more than 50.00% of the sum of total First-Out New Money Term Loans and Second-Out Term Loans at such time."  Notably, the SPCA did *not* specifically imbue Invesco with any right to hold "Required Lenders" status.  Instead, by definition, "Required Lenders" could change "at any time" as the lenders under the SPCA were prepaid or sold their holdings on the secondary market.

5.     As of the closing of the May 2023 Transactions, the Invesco Funds did not hold more than 50% of the combined First- and Second-Out Term Loans under the SPCA, and thus did not constitute "Required Lenders" under the SPCA.  However, as with any other SPCA lender, the Invesco Funds could acquire loans on the secondary market in an effort to reach the Required Lenders threshold. In June or July 2023, the Invesco Funds did just that, acquiring enough of the Second-Out Term Loans for Invesco alone to obtain Required Lenders status.  But Invesco's position was not guaranteed—while Invesco purchased sufficient loans so that it would have a majority of the **combined** First- and Second-Out Term Loans, it stopped short of purchasing *a majority of both* the First- and the Second-Out Term Loans tranches individually.  As a result, Invesco assumed the risk that it could lose Required Lenders status if Robertshaw voluntarily prepaid the First-Out Term Loans (of which Invesco held a majority), and the other lenders obtained a majority of the Second-Out positions.

6.     Momentarily installed as Required Lenders, Invesco began taking advantage of Robertshaw's sensitive financial condition to enhance its own returns at the expense of Robertshaw and other lenders, including the Lender Plaintiffs.  Invesco first cut Robertshaw off from additional sources of funding, scuttling a crucial refinancing of another credit agreement at the eleventh hour. Invesco then tried to force Robertshaw into a rushed chapter 11 filing by January 2, 2024, through

which Invesco would be able to purchase virtually all of Robertshaw's assets for pennies on the dollar, leaving other stakeholders (including Lender Plaintiffs) with virtually no recovery.

7.     Robertshaw began to consider alternative options that would afford the Company time to avoid a rushed bankruptcy and offer a better return to *all* stakeholders, and subsequently entered into the December 2023 Transactions with Lender Plaintiffs.  The December 2023 Transactions, which were structured to comply with the SPCA, provided Robertshaw with the capital to prepay virtually all of the outstanding First-Out Term Loans under the SPCA, the majority of which were held by Invesco.  As a result of the December 2023 Transactions, Invesco lost control of a majority of the First- and Second-Out Term Loans under the SPCA, and the Lender Plaintiffs obtained Required Lenders status.  Invesco, as a sophisticated investor, knew that its First-Out Term Loans could be voluntarily prepaid at any time.

8.     Upset that its plan to seize complete control over Robertshaw was thwarted, Invesco filed suit in the Supreme Court of the State of New York (the "**New York State Court**") challenging the December 2023 Transactions and claiming that Robertshaw and the Lender Plaintiffs breached their contractual duties and the implied covenant of good faith and fair dealing under the SPCA, that One Rock tortiously interfered with the SPCA, and that the Lender Plaintiffs and One Rock violated the New York Uniform Voidable Transaction Act (the "**Invesco Action**").  The Invesco Action has caused Robertshaw to incur substantial legal fees and distracted its management at a critical time.  While Invesco's claims are meritless, this adversary proceeding will confirm the priority status of a number of lenders as well as the identity of Required Lenders

under the SPCA.  Thus, its resolution is critical to the conclusion of these chapter 11 cases.
Plaintiffs, therefore, seek:

- A declaratory judgment confirming that the December 2023 Transactions were permitted under the SPCA and Robertshaw and the Lender Plaintiffs are therefore not in breach of contract;

- A declaratory judgment that no violations of the implied covenant or the New York Uniform Voidable Transaction Act occurred by entering into or carrying out the December 2023 Transactions;

- A declaratory judgment that One Rock did not tortiously interfere with the SPCA through its involvement with the December 2023 Transactions and, in any event, its economic interest in Robertshaw bars any such claim under New York law;

- A declaratory judgment confirming that the automatic stay under section 362(a) of title 11 of the United States Code (the "**Bankruptcy Code**") applies to bar further prosecution of Invesco Action against the Lender Plaintiffs and One Rock (together, "**Non-Debtor Parties**") or, in the alternative, can be and is extended to those Non-Debtor Parties, and

- To enjoin the Invesco Action pursuant to section 105(a) of the Bankruptcy Code, to the extent the Invesco Action is not completely barred by the automatic stay.[2]

---

[2]    In the alternative to issuing an injunction based on its statutory powers under section 362 and section 105 to enjoin the Invesco Action against the Non-Debtor Parties, the Court under its comprehensive jurisdiction conferred by 28 U.S.C. § 1334 can grant an injunction pursuant to the "inherent power of courts under their general equity powers and in the efficient management of the dockets to grant relief" to grant a stay. *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1003 (4th Cir. 1986); *see also Jonas v. Newman (In re Comark)*, 53 B.R. 945, 947 (Bankr. C.D. Cal. 1985) ("Under the provisions of 28 U.S.C. § 1334, in combination with § 105(a) of the Bankruptcy Code, the Bankruptcy Court has jurisdiction and power to enjoin the prosecution of actions against non-debtors where the action is related to a Title 11 case.").

9.      As discussed herein, in the Motion, and in the First Day Declarations,[3] the automatic stay applies to the Non-Debtor Parties because the Invesco Action against the Non-Debtor Parties is "an[] act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Defendant Invesco seeks to exercise control over the property of the Debtors' estate by challenging its contractual rights in, and the validity of, Amendment No. 5 to the SPCA and asserting fraudulent transfer claims, which only the Debtors have the right to pursue.  To the extent the stay under section 362(a)(3) does not automatically apply to Defendant Invesco's tortious interference claim against One Rock, this Court should extend the automatic stay because any judgment against One Rock is effectively a judgment against the Debtors.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

11.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

12.      This adversary proceeding is commenced pursuant to (a) Rule 7001(2) of the Bankruptcy Rules, which allows for a proceeding "to determine the validity, priority, or extent of a lien or other interest in property;" (b) Rule 7001(7) of the Bankruptcy Rules, which allows for a proceeding "to obtain an injunction or other equitable relief;" (c) Rule 7001(9) of the Bankruptcy Rules, which allows for a proceeding to obtain a declaratory judgment relating to the foregoing;

---

[3]    This Complaint is being filed contemporaneously with Debtors' Emergency Motion for Entry of an Order (A) Declaring that Automatic Stay Applies to Claims Asserted Against Non-Debtor Parties in Invesco Action or (B) Extending Automatic Stay and Preliminarily Enjoining Claims Against Non-Debtor Parties in Invesco Action (the "Motion") in this adversary proceeding, as well as the *Declaration of John Hewitt in Support of Chapter 11 Petitions and First Day Pleadings* and the *Declaration of Stephen Spitzer in Support of Chapter 11 Petitions and First Day Pleadings* (together, the "First Day Declarations").

and (d) section 105(a) of title 11 of the Bankruptcy Code.   Declaratory relief is appropriate pursuant to Rule 7001 of the Bankruptcy Rules and 28 U.S.C. § 2201.

13.     As set forth below, an actual legal controversy exists with respect to each of the counts brought herein.

14.     Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiff consents to the entry of a final judgment or order with respect to this Complaint if it is determined that this Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III jurisdiction of the United States Constitution.

## PARTIES

15.     Debtor and Plaintiff Robertshaw is a global design, engineering, and manufacturing company with its principal place of business in Itasca, Illinois, and its principal place of assets in Laredo, Texas and Brownsville, Texas.

16.     Plaintiff Bain Capital is an investment company that manages certain funds that hold secured debt issued by the Debtors, and is a defendant in the Invesco Action.  Bain Capital is a Delaware limited liability partnership.

17.     Plaintiff Canyon Capital in an investment company that manages certain funds that hold secured debt issued by the Debtors.  It is the real party in interest in the Invesco Action and seeks the relief herein with respect to Canyon Partners, LLC, which Invesco incorrectly named as a defendant in the Invesco Action.  Canyon Capital is a Delaware LLC.

18.     Plaintiff Eaton Vance is an investment company that manages certain funds that hold secured debt issued by the Debtors, and is a defendant in the Invesco Action.  Eaton Vance is a Massachusetts business trust.

19.     Plaintiff One Rock is an investment company that manages certain funds which directly or indirectly hold a majority equity interest in Range Parent, Inc. and secured debt issued by the Debtors.  One Rock is a defendant in the Invesco Action.  One Rock is a Delaware LLC.

20.     Upon information and belief, Defendant Invesco Secured Management, Inc. is an investment management company formed as a Delaware corporation with its principal place of business in New York, New York.

21.     Upon information and belief, Defendants Invesco Floating Rate Income Fund; Diversified Credit Portfolio Ltd.; Invesco Dynamic Credit Opportunity Fund; Invesco Floating Rate ESG Fund; Invesco Credit Partners Master Fund II, LP; Invesco Credit Partners Opportunities Fund 2020, L.P.; Invesco Private Credit Opportunities Holdco, LLC; Kapitalforeningen Investin Pro, US Leveraged Loans; Invesco Master Loan Fund; Milton Hershey School Trust; Invesco Senior Floating Rate Fund; Invesco Senior Income Trust; Invesco Senior Loan Fund; Sentry Insurance a Mutual Company; Invesco SSL Fund LLC; Invesco Teton Fund LLC; Invesco Zodiac Funds - Invesco US Senior Loan ESG Fund; Invesco Zodiac Funds - Invesco European Senior Loan ESG Fund; Invesco Zodiac Funds - Invesco European Senior Loan Fund; Invesco Zodiac Funds - Invesco US Senior Loan Fund; Alinea CLO, Ltd; Annisa CLO, Ltd.; Betony CLO 2, Ltd.; Carbone CLO, Ltd.; Milos CLO, Ltd.; Recette CLO, Ltd.; Riserva CLO Ltd.; Upland CLO, Ltd.; Verde CLO, Ltd.; and Kapitalforeningen Investin Pro, US Leveraged Loans I are collateralized loan obligation ("**CLO**"), CLO portfolios, proprietary or third-party funds that are issued, managed, or sponsored by Defendant Invesco Senior Secured Management, Inc.

## FACTUAL BACKGROUND

### A.     Robertshaw Enters Into the Original Credit Agreements.

22.     Robertshaw is a global design, engineering, and manufacturing company.  Since Frederick W. Robertshaw invented an innovative home water heater thermostat in 1899,

Robertshaw has cemented itself as an industry leader, having been awarded more than 2,000 patented inventions.  Today, Robertshaw sells high-quality control systems and component parts used in residential and commercial appliances, HVAC systems, and electric vehicles.

23.    On January 5, 2018, One Rock announced that it would acquire Robertshaw Controls Company, an affiliate of Robertshaw.  The acquisition closed approximately two months later on March 1, 2018.

24.    In order to fund the acquisition, on February 28, 2018, Robertshaw entered into the First-Lien Credit Agreement, through which Robertshaw borrowed $510 million secured by first-lien interests in substantially all of Robertshaw's tangible and intangible assets.  Robertshaw simultaneously entered into the Second-Lien Credit Agreement (together with the First-Lien Credit Agreement, the "**Original Credit Agreements**"), through which Robertshaw borrowed $110 million secured by second-lien interests in substantially all of Robertshaw's tangible and intangible assets.  At roughly the same time, Robertshaw also arranged the $50 million ABL Facility, which was set to mature in December 2023 and went undrawn for an extended period.

25.    The Original Credit Agreements provide Robertshaw with broad amendment rights with the consent of a simple majority of lenders.  Specifically, under Section 9.02(b), Robertshaw can "waive[], amend[] or modif[y]" the Original Credit Agreements "pursuant to an agreement or agreements in writing entered into by [Robertshaw] and the Required Lenders," *i.e.*, "Lenders having Loans or unused commitments . . . representing more than 50.0% of the sum of the total Loans[.]"  The only limitation on Robertshaw's broad amendment power is a narrow set of "sacred rights" carved out by Section 9.02(b)(A).  These rights may only be amended upon approval by each lender "directly and adversely affected thereby."  Required Lenders could also waive Events of Default under the Original Credit Agreements.

26.     The Original Credit Agreements contain the same core negative covenant found in the later SPCA that Invesco now wrongfully claims Robertshaw has breached.  Specifically, Section 6.01 of the Original Credit Agreements and SPCA prohibits Robertshaw and certain of its subsidiaries from incurring additional "Indebtedness."  Section 6.01 is not a "sacred right" under either the Original Credit Agreements or the SPCA, and it may be amended with consent of the Required Lenders.

**B.     Robertshaw Faces Financial Headwinds.**

27.     In the years following execution of the Original Credit Agreements, Robertshaw began facing financial headwinds as a result of macroeconomic and company-specific factors. Beginning in 2020, Robertshaw, like many companies, dealt with a series of operational challenges arising from the COVID-19 pandemic, including lockdowns, supply chain disruptions, labor shortages, port closures, higher freight charges, and increasing inflation.

28.     Robertshaw initially weathered the storm caused by COVID-19, but the long-term impact eventually became apparent.  The pandemic exposed weaknesses in Robertshaw's pricing strategies and procurement processes, as well as critical organizational inefficiencies.  In 2023, Robertshaw saw a substantial drop in sales, due at least in part to lingering shortages of several component parts required to produce goods, and by Robertshaw's customers having stockpiled inventory during and immediately after the pandemic.

29.     Robertshaw acted thoughtfully and diligently to try to address these issues.  It made sweeping changes to leadership and implemented new internal initiatives aimed at resolving certain operational challenges, re-developing long-term pricing strategies, and growing into new markets.  Robertshaw also addressed ongoing delivery and quality issues and sought to reduce inventory and limit order changes.  While these initiatives have shown promise and have had a positive impact on Robertshaw's business, the new measures took time to implement, and the

cumulative effect of the headwinds Robertshaw has faced caused a significant drop in revenue and substantially strained liquidity.

### C. Robertshaw, The Ad Hoc Group, and Other Lenders Enter Into The SPCA.

30. As it became apparent that business headwinds would make it impossible for Robertshaw to timely service its debt under the Original Credit Agreements, Robertshaw, with the help of Latham & Watkins LLP as outside counsel ("**Latham & Watkins**"), began to explore its options for a financing transaction. Throughout the first quarter of 2023, Robertshaw and its investment banker, Guggenheim Securities ("**Guggenheim**"), contacted multiple potential third-party financing sources to solicit proposals to refinance the Company's existing capital structure and provide Robertshaw with additional working capital. Various third parties submitted proposals for Robertshaw's consideration.

31. One such proposal was from the Ad Hoc Group of lenders under the Original Credit Agreements that included the Lender Plaintiffs *and* Defendant Invesco. The Ad Hoc Group collectively held 75% of the First Lien Loans and 59% of the Second Lien Loans, making them Required Lenders as defined in each of the Original Credit Agreements. With Invesco leading the charge, the Ad Hoc Group proposed the May 2023 Transactions, a series of transactions through which the parties would amend the Original Credit Agreements to permit Robertshaw to incur additional indebtedness, enter into the SPCA, provide the Company with $95 million of new "First-Out" debt, and allow participating lenders to sell their existing first- and second-lien loans under the Original Credit Agreements to Robertshaw in exchange for "Second-Out," "Third-Out," "Fourth-Out," and "Fifth-Out" debt issued under the new SPCA.

32. The Company, assisted by Guggenheim and Latham & Watkins, engaged in a months-long, arm's-length negotiation with the Ad Hoc Group. On May 9, 2023, after concluding that the Ad Hoc Group's proposal was the best financing opportunity available to Robertshaw to

address the business headwinds that had undermined Robertshaw's ability to service its existing debt, Robertshaw closed the May 2023 Transactions.  These Transactions gave Robertshaw a vital infusion of capital to fund its operations and pay down certain of its existing funded debt obligations.

33.    Invesco, as a member of the Ad Hoc Group, consented to the May 2023 Transactions and the execution of the SPCA.  In doing so, Invesco admitted that lenders holding the status of Required Lenders have the right to amend the Original Credit Agreements, including to amend the non-sacred right in Section 6.01 to allow Robertshaw to incur additional "Indebtedness."

34.    This admission is directly contrary to the position Invesco takes today while searching for a way to profit at the expense of Robertshaw and other stakeholders.  Invesco now claims in the Invesco Action that Robertshaw has breached multiple provisions of the SPCA, including Section 6.01, which nearly mirrors Section 6.01 of the Original Credit Agreements.[4] Section 6.01 of the SPCA, a "negative covenant," prohibits Range Parent, Inc., (Robertshaw's holding company), Robertshaw, and any "Subsidiary" of Robertshaw from "directly or indirectly creat[ing], incur[ring], assum[ing] or otherwise becom[ing] or remain[ing] liable with respect to any Indebtedness," subject to various exceptions not at issue in this dispute.  A "Subsidiary" for purposes of this negative covenant is defined in terms of entities over which the Robertshaw has voting control:

---

[4]    Notably, *Invesco itself* did not comply with the terms of the SPCA when it filed the Invesco Action.  Section 8 of the SPCA governs the duties, rights, and powers of the Administrative Agent, who is designated to act as an intermediary between Robertshaw and the lenders and who is "authorized" "to take such actions on [the Lenders'] behalf" to exercise powers delegated to it "by the terms of the Loan Documents."  These powers are far-ranging, and no lender may take any "enforcement action" under the SPCA without the Administrative Agent's written consent.

[an] entity of which more than 50.0% of the total voting power of shares of stock or other ownership interests entitled . . . to vote in the election of the Person or Persons . . . having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person o[r] a combination thereof.[5]

35.     In short, the SPCA prohibits Range Parent, Inc., Robertshaw, or a Subsidiary (i.e., an entity over whom Robertshaw has majority voting power) from incurring additional Indebtedness.  Nothing in Section 6.01 or any other provision of the SPCA prohibits the incurrence of Indebtedness by an entity over which Robertshaw has no voting control.  This negative covenant is one of the many terms of the SPCA that can be amended, modified, or waived with the consent of the Required Lenders, as Invesco itself has done in transactions previously (when situated as Required Lenders).

36.     Also relevant to this dispute are Sections 2.11, 9.02(b)(A)(9), and 9.02(b)(C)(1) of the SPCA, each of which Defendant Invesco wrongly claims in the Invesco Action that Robertshaw has breached.  As explained below, Robertshaw fully complied with all of these terms as well.

37.     Under Section 2.11 of the SPCA, Robertshaw has "the right *at any time* and from time to time to prepay any Class of Loans in whole *or in part* without premium or penalty (other than the Prepayment Premium, if any)."  To do so (i) Robertshaw must provide the Administrative Agent with notice, which can be done the same day as the prepayment (SPCA § 2.11(a)(ii)); (ii) Robertshaw must pay the Lenders a "Prepayment Premium" in addition to the repaid principal and

---

[5]    There is a second definition of "Subsidiary" listed in the SPCA immediately after the first.  The lead finance lawyers on both sides of the May 2023 Transactions agree this was a scrivener's error, and a comparison with the Original Credit Agreements, which were used as the model for the SPCA, confirms this.

accrued interest (*id.* § 2.11(c)); and (iii) prepayments must be distributed ratably among lenders (*id.* § 2.11(a)(i)).  In other words, Robertshaw has full authority to make whole or partial voluntary prepayments.  The *only* protection for lenders in the event that Robertshaw makes such a prepayment is the requirement that Robertshaw pay a "Prepayment Premium," defined in Section 2.11(c) as a percentage of the outstanding loan balance at the time of the prepayment.

38.     Section 9.02 of the SPCA broadly permits waiver, amendment, or modification "pursuant to an agreement or agreements in writing entered into by" Robertshaw and the "Required Lenders" or the Administrative Agent on behalf of the Required Lenders.  Like the Original Credit Agreements, the SPCA defines "Required Lenders" to mean "at any time, Lenders having Loans representing more than 50.0% of the sum of total First-Our New Money Term Loans and Second-Out Term Loans at such time."  The determination of which lenders constitute Required Lenders is not static.  Those who hold the title of Required Lenders may lose that status at any time due to any number of events.  Such events include, for instance, a fund selling its loan positions or voluntary prepayments decreasing lenders' holdings.

39.     Also like the Original Credit Agreements, the SPCA contains certain narrow "sacred rights"—provisions of the SPCA that cannot be modified without the consent of each adversely affected lender.  Section 9.02(b)(A)(9) is one such sacred right.  This Section provides that Robertshaw and the Required Lenders cannot agree to "authorize additional Indebtedness that would be issued under the Loan Documents for the purpose of influencing voting threshold" without the consent of "each Lenders directly and adversely affected thereby."  Required Lenders, by definition, already hold over 50% of the relevant Term Loans, and thus no agreement between Required Lenders and Robertshaw could possibly influence that threshold.  Instead, Section 9.02(b)(A)(9) pertains to agreements between Robertshaw and the Required Lenders to

14

"influence" the 75% voting threshold in Section 9.02(b)(C).  That threshold is not relevant to this dispute.

40.     Section 9.02(b)(C)(1)—which is *not* a "sacred right"—states that Robertshaw and the Required Lenders may not "subordinate" the "Term Facility" as a whole to "any other Indebtedness" without the consent of Lenders holding 75% of the First- and Second-Out Term Loans.

**D.     Invesco Purchases Loans On The Secondary Market To Obtain "Required Lenders" Status.**

41.     The loans underlying the SPCA are syndicated loans actively traded on the secondary market.  These loans do not grant any one specific lender or group of lenders unique rights not also available to the remaining lenders.

42.     The only lenders who can exert decision making control over the SPCA are those who at any given time constitute Required Lenders—*i.e.*, those lenders who hold more than 50% of the outstanding Loans.  When the May 2023 Transactions closed, the Invesco Funds did not hold more than 50% of the new First- and Second-Out Term Loans under the SPCA.  Thus, they were not—on their own—Required Lenders, and had no right to "control" or unilaterally approve certain amendments to the SPCA.

43.     Following the May 2023 Transactions, Invesco through the Invesco Funds began purchasing Term Loans on the secondary market and came to hold more than 50% of the *combined* First- and Second-Out Term Loans, including 62.26% of the outstanding First-Out Term Loans. As a result, Invesco gained Required Lenders status under the SPCA for the time being.  Critically, Invesco did not purchase a majority of the Second-Out Term Loans, owning just 49.11%—0.54% less than the Lender Plaintiffs who collectively held 49.65%.   Invesco was aware that the remaining 1.24% of the Second-Out Term Loans were owned by other, smaller individual lenders

and available for purchase.  Yet Invesco elected not to purchase sufficient debt to give it a majority of the Second-Out Term Loans, thereby assuming the risk that Invesco could lose Required Lenders status if Robertshaw voluntarily prepaid a sufficient portion of the First-Out Term Loans—which the SPCA expressly permitted it to do—and the Lender Plaintiffs obtained a majority of the Second-Out positions.

### E. Invesco Nixes Robertshaw's Efforts To Refinance Its ABL Facility.

44.  Invesco wasted no time using its temporary Required Lenders status to exert control over Robertshaw .  Shortly after acquiring more than 50% of the combined First-Out and Second-Out Term Loans, Invesco blocked a crucial refinancing of Robertshaw's ABL Facility that Robertshaw had successfully negotiated with Brigade Capital Management (the "**Brigade Transaction**").

45.  Robertshaw and its advisors began negotiating the Brigade Transaction in August 2023 to resolve two major liquidity-related issues Robertshaw was facing: *first*, the Brigade Transaction would extend the then-upcoming December 2023 maturity of the $50 million ABL Facility; and *second*, it would provide Robertshaw with an immediate cash infusion, which Robertshaw could use to make a rapidly-approaching interest payment due under the SPCA no later than October 6, 2023.

46.  Robertshaw negotiated the Brigade Transaction for more than a month, and by late September 2023, had reached agreement with Brigade on all terms.  Robertshaw and Brigade were set to close the transaction on October 5, 2023.  In advance of the closing, Invesco's advisors informed Robertshaw's advisors that the Brigade Transaction posed no problems under the SPCA.  However, on October 4, 2023—*just one day* before the Brigade Transaction was scheduled to close and two days before the deadline for the scheduled interest payment under the SPCA—Invesco used its status as Required Lenders to nix the deal, now insisting the Brigade Transaction would

violate the terms of the SPCA.  This was an about-face from Invesco's prior position expressed just days before.

47.     Upon learning of Invesco's objection, Brigade pulled out of the transaction.  As a result, Robertshaw was left with just one day to come up with sufficient capital to make the scheduled interest payment due under the SPCA.

48.     Mere hours after the deal disintegrated, and with full knowledge of the looming interest payment, Invesco (through new counsel at Ropes & Gray LLP) reached out to Robertshaw and—without informing any of the Lender Plaintiffs—presented Robertshaw with a proposed amendment to the SPCA that would extend the "grace period" for Robertshaw to make the scheduled interest payment until October 13, 2023 ("**Amendment No. 1**"), and a proposal (accompanied by a detailed term sheet) for Robertshaw to enter into a new ABL facility with Invesco.

49.     The terms of Invesco's proposal revealed its true intentions—to increase the Invesco Funds' returns at the expense of Robertshaw and the Lender Plaintiffs.  Under Invesco's proposal:

- Invesco would provide Robertshaw a $17 million "bridge loan" as an additional First-Out Term Loan under the SPCA that was to be used to pay interest and fees and expenses related the "bridge loan";

- Invesco would lend Robertshaw an additional $40 million in First-Out Term Loans if Robertshaw could satisfy certain conditions precedent, including refinancing the existing ABL Facility;

- Invesco would provide Robertshaw with a new ABL facility but would not allow Robertshaw to solicit ABL facility proposals from any other potential lenders.

50.     Robertshaw agreed to execute Amendment No. 1 to the SPCA with Invesco in order to briefly extend the deadline for the required interest payment until October 13, 2023, and subsequently attempted to negotiate the new ABL facility that Invesco wanted.

51.     Robertshaw and Invesco could not reach an agreement, and instead executed Amendment No. 2 to the SPCA on October 13, 2023.  Under this amendment, (i) Invesco loaned Robertshaw an additional $17 million in First-Out Term Loans to allow Robertshaw to make interest payments; and (ii) Invesco committed to provide an additional $40 million loan if Robertshaw could satisfy certain conditions precedent, including refinancing the existing ABL Facility with a new facility that would be used to prepay Invesco's Third-Out Term Loans. Amendment No. 2 also added a new Event of Default allowing Invesco to immediately declare the loans due and payable if, by November 8, 2023, Robertshaw was unable to enter into a new ABL facility—which Amendment 2 required be used to repay Invesco's Third-Out Term Loans rather than increasing Robertshaw's liquidity

52.     Amendment Nos. 1 and 2 were not posted to the Administrative Agent's lender site or otherwise made available to the Lender Plaintiffs when executed.   Invesco instructed Robertshaw to keep these amendments secret from the Lender Plaintiffs.

**F.     Invesco Attempts To Force Robertshaw Into Bankruptcy By January 2, 2024.**

53.     Robertshaw and Invesco spent the bulk of October attempting to negotiate additional financing in the form of an ABL facility, which would have allowed Robertshaw to extend looming maturities and given it time to implement its turnaround objectives.  Invesco knew that Robertshaw was working overtime to restore the business to its pre-COVID success and that,

if successful, these measures would increase the likely recoveries for *all* of Robertshaw's stakeholders.  But the terms that Invesco insisted upon for a new ABL facility, unlike the prior Brigade facility, would not give Robertshaw sufficient time or liquidity to implement its turnaround efforts, which included streamlining operations and negotiating commercial improvements such as pricing changes in key customer contracts.

54.     Robertshaw continued to negotiate in good faith, but in early November 2023, Invesco opted to abandon negotiations with Robertshaw over the ABL facility and, instead, attempted to force Robertshaw into a premature chapter 11 filing and 363 sale process through which Invesco intended to purchase a substantial stake in the Company at the expense of the Lender Plaintiffs.

55.     On November 8, 2023, Invesco agreed to extend the deadline to replace the ABL Facility by two days.  Invesco also required Robertshaw to acknowledge that its failure to obtain a new ABL facility—a matter solely within Invesco's control—would constitute an Event of Default.

56.     On November 9, 2023, Invesco put its new coercive plan into effect, sending a proposed "forbearance" agreement to Robertshaw and refusing to continue good faith negotiations on the ABL facility.  This agreement would later become Amendment No. 4 to the SPCA.  Under Amendment No. 4, Invesco agreed not to declare an Event of Default until December 31, 2023, *if and only if* Robertshaw agreed to negotiate certain terms relevant for a bankruptcy filing.  If Robertshaw did not sign Amendment No. 4, Invesco threatened to declare an Event of Default under the SPCA because the parties had not successfully negotiated an ABL facility by the Invesco-imposed deadline of November 13.  Invesco also refused to discuss alternative options to an Invesco-led bankruptcy, unless Robertshaw first executed Amendment No. 4, which committed

Robertshaw to a January 2, 2024 bankruptcy filing.  On November 13, 2023, with no other available options and the threat of an immediate Event of Default looming, Robertshaw had no choice but to sign Amendment No. 4.

57.     Notably, Amendment No. 4 required Robertshaw to appoint "at least one independent director" of Invesco's choosing to the Board of Directors of Robertshaw's parent company, Range Parent, Inc.  On November 20, 2023, Neal Goldman was formally appointed to the Board of Directors of Range Parent, Inc.

58.     Amendment No. 4 also required Robertshaw to (among other things):

- pay Invesco's financial and legal advisors (Amendment No. 4 § 7(a));

- negotiate debtor-in-possession financing and either a stalking horse purchase agreement or restructuring support agreement with Invesco, which would allow Invesco to prevent other parties from seriously competing for Robertshaw's assets (*id.* § 7(e));

- set milestone dates that Robertshaw was required to meet in negotiating documents related to the bankruptcy Invesco demanded Robertshaw file (*id.* § 7(f)); and

- file for bankruptcy on January 2, 2024 (*id.* § 7(f)(viii)).

59.     Invesco intended to keep Amendment No. 4 a secret from the Lender Plaintiffs and instructed Robertshaw not to disclose it to them.

**G.     Robertshaw Executes The December 2023 Transactions In An Effort To Avoid Imminent Bankruptcy.**

60.     On or around November 16, the Lender Plaintiffs gained access to Amendment Nos. 1-4 and learned of Invesco's plan to force Robertshaw into an Invesco-led bankruptcy.

61.     With Invesco no longer entertaining conversations about a non-bankruptcy solution, Robertshaw began considering alternative options to the draconian terms Invesco sought to impose on Robertshaw through Amendment No. 4; alternative options that could afford the Company time to complete its turnaround efforts without resorting to a rushed chapter 11.

62.     In late November 2023, Robertshaw, the Lender Plaintiffs, and One Rock began negotiating the terms of an alternative financing transaction that would address the critical liquidity problems the Company was facing and avoid near-term bankruptcy, all in full compliance with the terms of the SPCA.  This became the December 2023 Transactions.  On December 10, 2023, Robertshaw's Board of Directors voted in favor of pursuing the December 2023 Transactions, which they determined were in the best interest of all of the Company's stakeholders.  This vote included Mr. Goldman, who, despite being appointed by Invesco, understood that he owed fiduciary duties to protect the interests of all of the Company's stakeholders—not just Invesco. Accordingly, Mr. Goldman had urged Robertshaw and its advisors to explore available alternatives to the forced bankruptcy path set forth in Amendment No. 4, which he believed would be costly and needlessly damaging to the Company.  After comparing the merits of the December 2023 Transactions and the forced bankruptcy under Amendment No. 4, Mr. Goldman voted in favor of the December 2023 Transactions with the rest of the Board.

63.     The December 2023 Transactions involved six transactions: *First*, Range Investor Holdings, LLC ("**Investor Holdings**") (the parent of Range Parent) formed a limited liability company called RS Funding Holdings, LLC ("**RS Funding**").  RS Funding was established with both voting and non-voting membership units (Class V and Class E units, respectively).  Investor Holdings held 100% of RS Funding's voting units giving it the sole power to direct or cause the

direction of RS Funding's management and policies; Robertshaw held 100% of RS Funding's non-voting economic units, which carried no voting rights.



64.     Because Robertshaw had no power to direct or cause the direction of RS Funding's management and policies, RS Funding was not (and could not be) a "Subsidiary" of Robertshaw as defined under the SPCA.

65.     *Second*, after RS Funding was formed, the Lender Plaintiffs and One Rock agreed to jointly provide $228.3 million in fresh financing to RS Funding pursuant to a credit agreement dated December 11, 2023, by and between RS Funding, as the borrower, and Jefferies Capital Services, LLC ("**Jefferies**") and Range Finance Investors, L.P., as the lenders (the "**RS Funding Credit Agreement**").  Jeffries acted as an agent on behalf of the Ad Hoc Lenders and provided $186.6 million of the $228.3 million.  The remaining $41.7 million was provided by One Rock through Range Finance Investors, L.P.

66.     Because RS Funding is not a Robertshaw Subsidiary under the SPCA, Section 6.01—the provision restricting the ability of Robertshaw, Range Parent, and Subsidiaries to incur Indebtedness—did not apply to RS Funding.[6]

67.     *Third*, as the holder of 100% of the Class V voting units of RS Funding, Investor Holdings then instructed RS Funding to distribute the proceeds of the new loans provided by Jefferies and Range Finance Investors, L.P. to Robertshaw.

68.     *Fourth*, Robertshaw exercised its right under Section 2.11 of the SPCA to prepay loans "in part" by using the funds from RS Funding to voluntarily prepay $117.6 million of the outstanding First-Out Term Loans under the SPCA, and make an additional payment of $30.7 million to the holders of First-Out Term Loans in required Prepayment Premiums.  The voluntary prepayment was made to the Administrative Agent appointed in the SPCA—with notice provided to the Administrative Agent contemporaneously with the prepayment, which the SPCA expressly permits (Section 2.11(a)(ii)   The Administrative Agent in turn distributed the funds to the appropriate First-Out Term Loan Lenders on a *pro rata* basis.  Invesco received more than $92 million for the approximately $72.4 million par value of its First-Out Term Loans, reflecting a 26% return over seven months.

69.     Robertshaw also used part of the funds from RS Funding to pay off its outstanding $30.5 million ABL Facility in full.

70.     Following Robertshaw's voluntary prepayment of nearly all the First-Out Term Loans, the official Register maintained by the Administrative Agent reflected that $96,000 in First-

---

[6]     The December 2023 Transactions involved a borrowing by RS Funding in order to ensure strict compliance with the SPCA, but Robertshaw had other alternatives to obtain funding to effect the December Transactions.  For example, had the Company determined to incur Indebtedness itself, doing so would not have prohibited the prepayment of First-Out Term Loans as, even if such debt incurrence was an Event of Default, there is no prohibition on the prepayment of debt during the pendency of an Event of Default.

Out Term Loans remained, and the Invesco Funds now owned just 49.243%—*i.e.*, less than 50%—of the combined First- and Second-Out Term Loans.  Meanwhile, the official Register showed that after prepayment, the Lender Plaintiffs owned 50.051% of those Loan tranches.  As such, the Lender Plaintiffs now held sufficient loans to constitute Required Lenders under the SPCA, and Invesco did not.  The SPCA provides that the Register is "conclusive" as to loan ownership.

71.     *Fifth*, the Lender Plaintiffs, now the Required Lenders, executed Amendment No. 5 to the SPCA.  Amendment No. 5 allowed Robertshaw to incur $228.3 million in incremental debt under the SPCA.  There can be no dispute that Robertshaw and the Required Lenders are permitted to authorize incremental loans of this nature.  Invesco itself did so in Amendment No. 2, when, as-then Required Lenders, it authorized the issuance of $17 million in "incremental" First-Out Term Loans to cover its "bridge" loan.

72.     *Finally*, following its execution, all of the conditions precedent to the effectiveness of Amendment No. 5 were either satisfied "or waived by the Consenting [Required] Lenders," as allowed in Section 7 of Amendment No. 5.  Robertshaw issued the $228.3 in incremental First- and Second-Out Term Loans to the lenders as set forth in Amendment No. 5.  Robertshaw then returned an equivalent amount to RS Funding, which, in turn, prepaid the outstanding loans it had issued under the RS Funding Credit Agreement.

73.     The December 2023 Transactions complied with the terms of the SPCA.  The December 2023 Transactions did not affect any "sacred right" provisions, and the amendments to the SPCA were made with the consent of the Required Lenders (and in the best interests of the Company).

74.     As a result of the December 2023 Transactions, Robertshaw was able to avoid a chapter 11 filing in early January 2024.

**H.** **Invesco Files Suit In New York State Court.**

75.     Unfortunately, nine days after Robertshaw and the Lender Plaintiffs executed Amendment No. 5, Invesco commenced the Invesco Action.  The complaint alleges, among other things, that the December 2023 Transactions breached various provisions of the SPCA, that Robertshaw breached the implied covenant of good faith and fair dealing, that One Rock tortiously interfered with the SPCA, and that Amendment No. 5 and the December 2023 Transactions preceding Amendment No. 5 are not valid and enforceable.  Invesco did not obtain the Administrative Agent's written consent to bring suit as required by Section 8 of the SPCA.

76.     In connection with the Invesco Action, Invesco has sought a preliminary injunction to enjoin Amendment No. 5 and reinstate Amendment No. 4.  In connection with a preliminary injunction hearing, Robertshaw and Invesco engaged in limited discovery on an expedited basis. To date, two depositions of Invesco personnel have occurred.

**I.** **Robertshaw Files For Chapter 11 Protection.**

77.     As described more fully in the First Day Declarations, the Company continued to evaluate potential long-term solutions to provide workable capital, but the longstanding effects of COVID-19 on Robertshaw's business, the unexpected cash burn associated with defending the Invesco Action, and the havoc Invesco continues to wreak on Robertshaw's ability to secure additional funding, have left Robertshaw unable to avoid this chapter 11 filing.

78.     The Invesco Action is subject to an automatic stay.  *See* 11 U.S.C. § 362(a) (the automatic stay operates as a stay, applicable to all entities, of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [chapter 11]").

79.     Whether the December 2023 Transactions were valid under the SPCA is a core issue that goes to the heart of Robertshaw's efforts to reorganize its capital structure pursuant to

the Joint Chapter 11 Plan of Robertshaw and its Affiliated Debtors.  This issue must be resolved for Robertshaw to successfully emerge from chapter 11.

## COUNT ONE
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

80.     The allegations set forth above are incorporated herein by reference.

81.     A real and justiciable controversy exists as to whether Robertshaw and the Lender Plaintiffs acted in accordance with the terms of the SPCA with respect to the December 2023 Transactions.  The permissibility of those Transactions has been challenged by Defendant Invesco through the Invesco Action, which is currently stayed.  Specifically, Defendant Invesco has alleged that: (a) the December 2023 Transactions breached various provisions of the SPCA; (b) the December 2023 Transactions breached the implied covenant of good faith and fair dealing; (c) One Rock tortiously interfered with the SPCA; and (d) Amendment No. 5 and the December 2023 Transactions preceding Amendment No. 5 are not valid and enforceable.  This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act.  28 U.S.C. §§ 2201-2202.

82.     Resolution of this controversy is necessary in order to, among other things, "determine the validity, priority, or extent of a lien or other interest in property" of the Debtors, pursuant to Bankruptcy Rule 7001(2), and to define Debtors' ongoing rights and obligations under the Original Credit Agreements and SPCA.

83.     There is no adequate remedy at law.

84.     Accordingly, Robertshaw and the Lender Plaintiffs seek an order declaring that: (a) the December 2023 Transactions did not breach the SPCA; (b) Robertshaw and the Lender Plaintiffs have not breached the implied covenant of good faith and fair dealing through the December 2023 Transactions or any other action alleged by Defendant Invesco; (c) One Rock did

not tortiously interfere with the SPCA; (d) Amendment No. 5 and the SPCA as amended by Amendment No. 5 are valid and enforceable contracts; (e) no Event of Default has occurred under the SPCA; and (f) no payments made by or liens or contractual rights given by Robertshaw in connection with the December 2023 Transactions constitute fraudulent transfers under the New York Uniform Voidable Transaction Act.

### COUNT TWO
**(Extension of Automatic Stay Pursuant to Section 362 of the Bankruptcy Code)**

85.     The allegations set forth above are incorporated herein by reference.

86.     Upon the commencement of a bankruptcy case, the automatic stay operates as a stay, applicable to all entities, of "the commencement or continuation . . . of a judicial, administrative, or other action of proceeding against the debtor that was or could have bene commenced before the commencement of the case under [chapter 11]," or "any act to obtain possession of property of the estate or of property from the estate  or toe exercise control over property of the estate."  *See* 11 U.S.C. § 362(a)(1), (3).

87.     "Any action to obtain possession of property from the estate or to exercise control over property of the estate" is automatically stayed under section 362(a)(3).  Contracts, such as the SPCA and Amendment No. 5 thereto, are property of Robertshaw's estate.  *See A.H. Robins*, 788 F.2d at 1001-02.  The Invesco Action challenges the validity of the SPCA and Amendment No. 5 thereto, both of which Robertshaw is a party to and the main beneficiary thereunder.

88.     If the stay is not automatically applicable, bankruptcy courts in the Fifth Circuit have the authority to extend the automatic stay to non-debtor third parties "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'"  *See Reliant Energy Servs. v. Enron Can. Corp.*, 349 F.3d 816, 825

(5th Cir. 2003) (quoting *A.H. Robins*, 788 F.2d at 999). "An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *A.H. Robins*, 788 F.2d at 999 (affirming district court's order staying the proceedings against third-party defendants who were indemnified by the debtor); *see also Reliant Energy Servs.,* 349 F.3d at 825 (recognizing that contractual indemnification operates to create an identity of interests between a debtor and non-debtor).

89.     Here, there is an identity of interests between Robertshaw, the Lender Plaintiffs, and One Rock as defendants in the Invesco Action because of the contractual relationship between such parties, including specifically Robertshaw's obligation to indemnify the Non-Debtor Parties such that a judgment against the Non-Debtor Parties would, in effect, be a judgment against Robertshaw. *See, e.g.*, *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 1990) (finding that the bankruptcy court appropriately stayed an action against a non-debtor third party pursuant to § 362(a)(1) where the debtor was obligated to indemnify non-debtors with respect to claims in that action); *Am. Film Techs. Inc. v. Taritero (In re Am. Film Techs. Inc.)*, 175 B.R. 847, 853 (Bankr. D. Del. 1994) (extending the automatic stay to non-debtor directors and officers, in part, because "there is an entitlement to indemnification between the debtor and its officers and directors").

90.     A bankruptcy court may also extend the automatic stay to a non-debtor when "a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287 (2d Cir. 2003). Prosecution of the Invesco Action against the Non-Debtor Parties would burden or prejudice the Debtors who have an interest in the Invesco Action, adversely impacting Robertshaw's reorganization by distracting key company personnel during a critical time and depleting estate resources.

## COUNT THREE
### (Injunction Pursuant to Section 105 of the Bankruptcy Code)

91.     The allegations set forth above are incorporated herein by reference.

92.     Section 105(a) of the Bankruptcy Code permits bankruptcy courts to issue any order "necessary or appropriate" to assure the administration of the Debtor's bankruptcy estate, including issuing injunctions to extend the automatic stay to non-debtors.  *See* 11 U.S.C. § 105(a); *Villarreal v. N.Y. Marine & Gen. Ins. Co. (In re OGA Charters, LLC)*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016).  A bankruptcy court may enjoin a pending suit where, as here, "the non-debtor and the debtor enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor," or "the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization."  *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995).

93.     When implementing a temporary injunction to extend the automatic stay to non-debtors, courts consider: (1) if the movant is "likely to succeed on the merits," (2) if the movant is "likely to suffer irreparable harm in the absence of preliminary relief," (3) if the balance of equities tips in the movant's favor, and (4) whether granting the injunction "is in the public interest."  *In re OGA Charters, LLC*, 554 B.R. at 424 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

94.     Here, all four requirements for a preliminary injunction are met.

95.     For the reasons discussed above, Robertshaw is likely to demonstrate that extension of the automatic stay is warranted under applicable case law in satisfaction of the first factor.

96.     As to the second factor, an injunction is necessary to prevent irreparable harm to Robertshaw and its estate for three reasons.  *First*, it is simply not possible for the Debtors to be bystanders to the Invesco Action—which puts the issue of whether Amendment No. 5 is valid

before the New York State Court—if the action moves forward against the Non-Debtor Parties given the significance of the action to the Debtors' assets. *See In re Lomas Financial Corp.*, 117 B.R. at 67 (finding that debtor's reorganization efforts would be irreparably harmed if the suit against a non-debtor was not stayed because "[i]t [was] not possible for [the company] to be a bystander to a suit which may have a $20 million issue preclusion effect against it"). As such, without obtaining injunctive relief, the Debtors will be forced to defend against the Invesco Action, an action that goes to a central dispute in the Chapter 11 cases, or else face irreparable harm in the form of losses to creditors and parties-in-interest, and the diversion of funds away from the estate given the Debtors' indemnification obligations. *See In re Acis Cap. Mgmt., L.P.*, No. 18-30212-SGJ (Bankr. N.D. Tex. July 10, 2018), ECF No. 21 (granting injunction as "necessary here to prevent imminent and irreparable injury in the form of substantial losses to creditors and parties-in-interest"); *In re LTL Mgmt., LLC*, 638 B.R. 291, 307 (Bankr. D.N.J. 2022) (finding that extension of the automatic stay to non-debtors was warranted where "continued litigation against the [p]rotected [p]arties would divert funds and resources toward defense costs and potentially disrupt the flow of funds and resources" towards the debtors' estates). *Second*, continued prosecution of the Invesco Action would distract the Debtors' key employees and divert time and resources away from the Debtors' restructuring, potentially threatening the Debtors' ability to swiftly and efficiently resolve these Chapter 11 cases. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (enjoining non-debtors from continuing lawsuit "[b]ecause the suit would ultimately divert the debtor's resources and attention from the bankruptcy process"). *Finally*, for the foregoing reasons, continuation of the Invesco Action against the Non-Debtor Parties would frustrate the purpose of the automatic stay—to provide Debtors with a "breathing

spell" to allow them to focus on the bankruptcy proceedings. *Matter of Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1182 (5th Cir. 1986).

97.     In contrast to the immediate and irreparable harm the Debtors and their estates would face if injunctive relief were denied, the only potential harm faced by the Defendants is mere delay caused by extending the automatic stay to the Invesco Action during the pendency of the Debtors' Chapter 11 cases.  Mere delay as a result of an injunction issued until bankruptcy proceedings are resolved is not a significant harm. *In re Lazarus Burnam Assocs.*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993).  Moreover, the Defendants will suffer no material harm from this delay given that the Debtors and the Non-Debtor Parties have separately initiated this adversary proceeding to efficiently and comprehensively resolve the claims raised by Defendant Invesco in the Invesco Action.  Thus, the balance of equities weighs in Robertshaw's favor.

98.     As to the fourth factor, public interest favors an injunction, which would enable the Debtors' to maximize the value of their estates and focus on successfully reorganizing in chapter 11—two paramount goals of the Bankruptcy Code.

99.     For these reasons, Robertshaw submits that extension of the automatic stay is warranted to prevent Robertshaw and its estate from suffering irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

a)  confirming through a declaratory judgment that:

   i.    the December 2023 Transactions were permitted under the SPCA;

   ii.   Robertshaw and the Lender Plaintiffs have not breached the implied covenant of good faith and fair dealing;

   iii.  One Rock has not tortiously interfered with the SPCA;

   iv.   Amendment No. 5 and the SPCA as amended by Amendment No. 5 are valid and enforceable;

     v.     no Event of Default has occurred under the First-Lien Credit Agreement or the Second-Lien Credit Agreement; and

     vi.    no payments made by Robertshaw or obligations, liens or contractual rights given by Robertshaw to Lender Plaintiffs or One Rock as part of the December 2023 Transactions constitute fraudulent transfers under the New York Uniform Voidable Transaction Act;

b) declaring that the automatic stay already stays the Invesco Action under section 362 of the Bankruptcy Code as to the following Non-Debtor Parties in the Invesco Action or, in the alternative, that this Court effectively extend the automatic stay under section 362 of the Bankruptcy Code to all named defendants in the Invesco Action:

     i.     One Rock Capital Partners, LLC;

     ii.    Bain Capital LP;

     iii.   Eaton Vance Management; and

     iv.   Canyon Partners, LLC;

c) enjoining the Invesco Action under section 105 of the Bankruptcy Code, as applicable to all named defendants in the Invesco Action:

     i.     One Rock Capital Partners, LLC;

     ii.    Bain Capital LP;

     iii.   Eaton Vance Management; and

     iv.   Canyon Partners, LLC;

d) awarding all such other and further relief, at law or in equity, that this Court deems just and proper.

Dated: February 15, 2024

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email:  taddavidson@HuntonAK.com
            ashleyharper@HuntonAK.com
            pguffy@HuntonAK.com

- and -

George A. Davis (NY Bar No. 2401214)
George Klidonas (NY Bar No. 4549432)
Adam S. Ravin (Texas Bar No. 24113705)
Yelizaveta ("Liza") Burton*[7]
Eric F. Leon*
Kuan Huang*
Ryan Jones*
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:  george.davis@lw.com
            george.klidonas@lw.com
            adam.ravin@lw.com
            liza.burton@lw.com
            eric.leon@lw.com
            kuan.huang@lw.com
            ryan.jones@lw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

---

[7]   *Pro hac vice* forthcoming.

**O'MELVENY & MYERS LLP**
Peter Friedman - Attorney-In-Charge*
pfriedman@omm.com
Pamela A. Miller*
pmiller@omm.com
Daniel S. Shamah*
dshamah@omm.com
Asher Rivner*
arivner@omm.com
Times Square Tower
7 Times Square
New York, NY  10036
Telephone: (212) 326-2000

Nicholas J. Hendrix (Texas Bar No. 24087708)
(Southern District of Texas Bar No. 2524989)
nhendrix@omm.com
2801 North Harwood Street, Suite 1600
Dallas, Texas  75201-2692
Telephone: (972) 360-1900

*Attorneys for Bain Capital Credit, LP, Canyon Capital Advisors LLC, and Eaton Vance Management*

Sidney P. Levinson*
Erica S. Weisgerber*
Molly Baltimore Maass*
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Email:   slevinson@debevoise.com
         eweisgerber@debevoise.com
         mbmaass@debevoise.com

- and -

Sean T. Wilson (Texas Bar No. 24077962)
**KELLEY DRYE & WARREN LLP**
515 Post Oak Blvd, Suite 900
Houston, Texas 77027
Telephone: (713) 355-5000
Email:   swilson@kelleydrye.com

*Counsel to One Rock Capital Partners, LLC*