**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ROBERTSHAW US HOLDING CORP., *et al.*, | : | Case No. 24-90052 (CML) |
| | : | |
| Debtors.[1] | : | (Joint Administration Requested) |
| | : | |
| | : | |
| ROBERTSHAW US HOLDING CORP.; BAIN CAPITAL CREDIT, LP.; CANYON CAPITAL ADVISORS LLC; EATON VANCE MANAGEMENT; and ONE ROCK CAPITAL PARTNERS, LLC, | : | Adversary Proc. No. 24-3024 |
| | : | |
| | : | (Emergency Hearing Requested) |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| INVESCO SENIOR SECURED MANAGEMENT INC.; INVESCO FLOATING RATE INCOME FUND; DIVERSIFIED CREDIT PORTFOLIO LTD.; INVESCO DYNAMIC CREDIT OPPORTUNITY FUND; INVESCO FLOATING RATE ESG FUND; INVESCO CREDIT PARTNERS MASTER FUND II, LP; INVESCO CREDIT PARTNERS OPPORTUNITIES FUND 2020, L.P.; INVESCO PRIVATE CREDIT OPPORTUNITIES HOLDCO, LLC; KAPITALFORENINGEN INVESTIN PRO, US LEVERAGED LOANS; INVESCO MASTER LOAN FUND; MILTON HERSHEY SCHOOL TRUST; INVESCO SENIOR FLOATING RATE FUND; INVESCO SENIOR INCOME TRUST; INVESCO SENIOR LOAN FUND; SENTRY INSURANCE A MUTUAL COMPANY; INVESCO SSL FUND LLC; INVESCO TETON FUND LLC; | : | |

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are as follows: Range Parent, Inc. (7956); Robertshaw US Holding Corp. (1898); Robertshaw Controls Company (9531); Burner Systems International, Inc. (8603); Robertshaw Mexican Holdings LLC (9531); Controles Temex Holdings LLC (9531); Universal Tubular Systems, LLC (8603); and Robertshaw Europe Holdings LLC (8843). The primary mailing address used for each of the foregoing debtors is 1222 Hamilton Parkway, Itasca, Illinois 60143.

INVESCO ZODIAC FUNDS - INVESCO US          :
SENIOR LOAN ESG FUND; INVESCO ZODIAC       :
FUNDS - INVESCO EUROPEAN SENIOR LOAN       :
ESG FUND; INVESCO ZODIAC FUNDS -           :
INVESCO EUROPEAN SENIOR LOAN FUND;         :
INVESCO ZODIAC FUNDS - INVESCO US          :
SENIOR LOAN FUND; ALINEA CLO, LTD;         :
ANNISA CLO, LTD.; BETONY CLO 2, LTD.;      :
CARBONE CLO, LTD.; MILOS CLO, LTD.;        :
RECETTE CLO, LTD.; RISERVA CLO LTD.;       :
UPLAND CLO, LTD.; VERDE CLO, LTD.;         :
KAPITALFORENINGEN INVESTIN PRO, and US     :
LEVERAGED LOANS I,                         :
                                           :
                    Defendants.            :
                                           :

**DEBTOR ROBERTSHAW'S <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER
(A) DECLARING THAT AUTOMATIC STAY APPLIES TO CLAIMS ASSERTED
AGAINST NON-DEBTOR PARTIES IN INVESCO ACTION OR (B) EXTENDING
AUTOMATIC STAY AND PRELIMINARILY ENJOINING CLAIMS
AGAINST NON-DEBTOR PARTIES IN INVESCO ACTION**

> **Emergency relief has been requested.  Relief is requested not later than 5:00 p.m. (prevailing Central Time) on February 21, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**CONTENTS**

RELIEF REQUESTED AND BASES THEREOF.................................................................1

JURISDICTION AND VENUE ..........................................................................................4

FACTUAL BACKGROUND ...............................................................................................4

     A.     Overview of the Chapter 11 Cases...........................................................4
     B.     The Relevant Loan Transactions ............................................................5
     B.     The Invesco Action ...............................................................................11
     C.     The Debtors' Indemnification Obligations ...........................................13

ARGUMENT ....................................................................................................................14

I.     THE AUTOMATIC STAY APPLIES TO CLAIMS AGAINST THE NON-DEBTOR PARTIES IN THE INVESCO ACTION BECAUSE THE CLAIMS ASSERTED ARE PROPERTY OF THE ESTATE OR SEEK TO EXERCISE CONTROL OVER PROPERTY OF THE ESTATE.........................................14

     A.     Bankruptcy Code Section 362(a)(3) Stays All Claims in the Invesco Action Seeking to Void the Debtors' Property Interests under Amendment No. 5. ................................................................................15
     B.     Bankruptcy Code Section 362(a)(3) Stays the Fraudulent Transfer Claims Asserted in the Invesco Action Because Such Claims Belong to the Debtors' Estates ...............................................................................18

II.     IN THE ALTERNATIVE, THE AUTOMATIC STAY SHOULD BE EXTENDED TO CLAIMS AGAINST THE NON-DEBTOR PARTIES IN THE INVESCO ACTION BECAUSE ANY JUDGMENT AGAINST THE NON-DEBTOR PARTIES IS EFFECTIVELY A JUDGMENT AGAINST THE DEBTORS ........................................................................................................20

III.     ALTERNATIVELY, THE COURT SHOULD EXERCISE ITS EQUITABLE POWERS TO STAY THE INVESCO ACTION AGAINST THE NON-DEBTOR PARTIES .....................................................................................23

     A.     The Debtors Are Likely to Succeed on the Merits in the Adversary Proceeding...........................................................................................24
     B.     The Debtors Will Be Irreparably Harmed Without a Stay ...................28
     C.     The Balance of Harms Substantially Weighs in the Debtors' Favor....29
     D.     The Public Interest Weighs in the Debtors' Favor................................31

EMERGENCY CONSIDERATION ..................................................................................32

RESERVATION OF RIGHTS ..........................................................................................32

NOTICE.............................................................................................................................33

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*A.H. Robins Co. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ......................................................................21, 22, 29

*Aimco CLO 10 Ltd v. Revlon, Inc. (In re Revlon Inc.)*,
  No. 22-01167, 2023 WL 2229352 (Bankr. S.D.N.Y. Feb. 24, 2023).....................18

*Allied Home Mortg. Corp. v. Donovan*,
  830 F. Supp. 2d 223 (S.D. Tex. 2011) ...............................................................24, 28

*In re AP Indus., Inc.*,
  117 B.R. 789 (Bankr. S.D.N.Y. 1990)........................................................................19

*Arnold v. Garlock, Inc.*,
  278 F.3d 426 (5th Cir. 2001) .............................................................20, 21, 22, 23

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
  150 N.Y.S.3d 894 (N.Y. Sup. Ct. Aug. 16, 2021) ...................................................30

*In re Boates*,
  554 B.R. 472 (B.A.P. 9th Cir. 2016).........................................................................15

*Bonnevill Power Admin. v. Mirant Corp. (In re Mirant Corp.)*,
  440 F.3d 238 (5th Cir. 2006) ....................................................................................16

*Brown v. Deutsche Bank Nat'l Tr. Co.*,
  120 A.D.3d 440 (N.Y. App. Div. 1st Dep't 2014)...................................................27

*Brown, et al. v. Chesnut (In re Chesnut)*,
  422 F.3d 298 (5th Cir. 2005) ..............................................................................16, 17

*In Re Caesars Ent. Operating Co.*,
  561 B.R. 441 (Bankr. N.D. Ill. 2016) ......................................................................31

*Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*,
  84 A.D.3d 439 (N.Y. App. Div. 1st Dep't 2011)......................................................26

*In re Chiron Equities, LLC*,
  552 B.R. 674 (Bankr. S.D. Tex. 2016) ...............................................................24, 29

*City of Chicago, Ill. v. Fulton*,
  592 U.S. 154 (2021)..............................................................................................15, 18

*In re Commonwealth Oil Refining Co., Inc.*,
    805 F.2d 1175 (5th Cir. 1986) ........................................................24

*In re Continental Air Lines, Inc.*,
    61 B.R. 758 (S.D. Tex. 1986) ........................................................23

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) ........................................................28

*DSC Commc'ns Corp. v. DGI Techs., Inc.*,
    81 F.3d 597 (5th Cir. 1996) ........................................................29

*Eaton Vance Management v. Wilmington Sav. Fund Soc., FSB*,
    2018 WL 1947405 (N.Y. Sup. Apr. 25, 2018) ........................................................30

*Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc'y, FSB*,
    171 A.D.3d 626 (N.Y. App. Div. 2019) ........................................................30, 31

*In re Fed. Life Ins. (Mut.) v. First Fin. Grp. of Tex., Inc.*,
    3 B.R. 375 (S.D. Tex. 1980) ........................................................20

*Fesseha v. TD Waterhouse Inv'r Servs., Inc.*,
    305 A.D.2d 268 (N.Y. App. Div. 1st Dep't. 2003) ........................................................26

*Highland Cap. Mgmt. LP, et al. v. Chesapeake Energy Corp., et al.*
    *(In re Seven Seas Petroleum)*, 522 F.3d 575 (5th Cir. 2008) ........................................................14

*In Re Hunt*,
    93 B.R. 484 (Bankr. N.D. Tex. 1988) ........................................................29

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*,
    2022 WL 10085886 (N.Y. Sup. Oct. 17, 2022) ........................................................30

*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico, as representative of*
    *Puerto Rico Highways and Transp. Auth.*, No. 17-bk-3567-LTS (Dist. Puerto Rico) ............16

*Jack L. Inselman & Co. v. FNB Fin. Co.*,
    41 N.Y.2d 1078 (1977) ........................................................21

*In re Jackson*,
    No. 06-36268 2012 WL 3071218 (Bankr. S.D. Tex. July 27, 2012) ................................15, 17

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ........................................................28

*Licensing by Paolo v. Sinatra (In re Gucci)*,
    126 F.3d 380 (2d Cir. 1997) ........................................................15

*Maxon Int'l Inc. v. Int'l Harvester Co.*,
   82 A.D.2d 1006 (N.Y. App. Div. 3d Dep't 1981), aff'd, 56 N.Y.2d 879 (1982) ...................26

*Mill Fin., LLC v. Gillet*,
   122 A.D.3d 98 (N.Y. App. Div. 1st Dep't 2014).....................................................................27

*In re MortgageAmerica Corp.*,
   714 F.2d 1266 (5th Cir. 1983) ...............................................................................................19

*In re OGA Charters, LLC*,
   554 B.R. 415 (S.D. Tex. 2016) .........................................................................................23, 31

*Reliant Energy Servs, Inc. v. Enron Canada Corp.*,
   349 F.3d 816 (5th Cir. 2003) .............................................................................................20, 22

*In re S.I. Acquisition, Inc.*
   817 F.2d 1142 (5th Cir. 1987) ..............................................................................15, 18, 22, 23

*Sebastian v. Tex. Dept. of Corrections*,
   541 F. Supp. 970 (S.D. Tex. 1982) ........................................................................................24

*Stoker v. Aurora Loan Servs. Inc., et al.*,
   No. 09-33976, 2010 WL 958030 (Bankr. S.D. Tex. March 10, 2010)...................................16

*The Cadle Co. v. Mims, et al. (In re Moore)*,
   608 F.3d 253 (5th Cir. 2010) ..................................................................................................19

*Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*,
   2021 WL 710816 (Del. Super. Ct. Feb. 23, 2021)..................................................................19

*Wachtel v. Park Ave & 84th St., Inc.*,
   180 A.D.3d 545 (N.Y. App. Div. 1st Dep't 2020)..................................................................25

*Wedgeworth v. Fibreboard Corp.*,
   706 F.2d 541 (5th Cir. 1983) ..................................................................................................23

*In re Wilton Armetale, Inc.*,
   968 F.3d at 284 ........................................................................................................................19

*In re Windstream Holdings, Inc.*, 627 B.R. 32 (Bankr. S.D.N.Y. 2021),
   vacated in part, 634 F. Supp. 3d 99 (S.D.N.Y. 2022)............................................................15

*In re Zale Corp.*,
   62 F.3d 746 (5th Cir. 1995) ....................................................................................................24

# STATUTES

11 U.S.C.
    §§ 101-1532 ............................................................................................................3
    § 105(a) ..................................................................................................3, 23, 24
    § 362(a) .................................................................................................................3
    § 541 ...................................................................................................................16

28 U.S.C.
    § 157(b) ................................................................................................................4
    § 1334 ...................................................................................................................4
    § 1408 ...................................................................................................................4
    § 1409 ...................................................................................................................4

6 Del. Code Ann. § 1304 ...........................................................................................19

Bankruptcy Code
    § 105 ..............................................................................................................23, 29
    § 362(a)(1) ...........................................................................................................23
    § 362(a)(3) ...................................................................................................... *passim*
    § 363 .....................................................................................................................8
    § 363(b) ...............................................................................................................19
    § 365 ...................................................................................................................32
    § 544 ...................................................................................................................19
    § 1107 ...................................................................................................................5
    § 1108 ...................................................................................................................5

N.Y. Debt & Cred. Law § 273 ...................................................................................19

# RULES

Bankruptcy Rule
    1015(b) .................................................................................................................5
    2002 ...................................................................................................................33

Fed. R. Bankr. P.
    7001(7) .................................................................................................................3
    7007 .....................................................................................................................3
    7065 .....................................................................................................................3

Fed. R. Civ. P. 65 ......................................................................................................24

Local Rule
    7007-1 ..................................................................................................................4
    9013-1 ..................................................................................................................4
    9013-1(i) .............................................................................................................32

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III ........................................................................................................4

Debtor Robertshaw US Holding Corporation (collectively with the debtors in these chapter 11 cases, the "<u>Debtors</u>" or "<u>Robertshaw</u>"), as plaintiff in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>"), respectfully moves (this "<u>Motion</u>") for entry of an order (a) declaring that the automatic stay applies to claims asserted against Bain Capital Credit, LP on behalf of certain of its managed funds ("<u>Bain Capital</u>"), Canyon Capital Advisors LLC on behalf of certain of its managed funds ("<u>Canyon Capital</u>"), Eaton Vance Management on behalf of certain of its managed funds ("<u>Eaton Vance</u>," together with Bain Capital and Canyon Capital, the "<u>Lender Plaintiffs</u>"), and One Rock Capital Partners LLC ("<u>ORC</u>," together the Lender Plaintiffs, the "<u>Non-Debtor Parties</u>," and with Robertshaw, collectively, the "<u>Plaintiffs</u>") in the Invesco Action (as defined below) or, alternatively, (b) extending the automatic stay and preliminarily enjoining claims against the Non-Debtor Parties in the Invesco Action.[2]  In support of the Motion, Robertshaw respectfully states as follows.

## <u>RELIEF REQUESTED AND BASES THEREOF</u>[3]

1.      The Debtors comprise a global design, engineering, and manufacturing company that manufactures more than 10,000 sophisticated controls for commercial and residential appliances.  The Debtors' business has been seriously and adversely impacted by a series of challenges associated with COVID-19 that have placed the Debtors in a precarious financial position.  While the Debtors have implemented a turnaround plan that already is showing real signs of success, the Debtors currently are unable to meet their debt obligations and need to de-leverage their business.  Through these chapter 11 proceedings, the Debtors hope to implement a sale of

---

[2]    In addition, Robertshaw seeks authorization to file a stay extension notice in the Invesco Action, substantially in the form appended to the Order as Appendix I, notifying all parties that the automatic stay applies to claims asserted against the Non-Debtor Parties in the Invesco Action or extending the automatic stay and preliminarily enjoining claims against the Non-Debtor Parties in the Invesco Action.

[3]    Unless otherwise indicated, citations and quotations are omitted, emphasis is added, and citations to "Ex. __" refer to the exhibits being submitted with this Motion.

assets pursuant to section 363 of the Bankruptcy Code that will preserve the business and maximize recoveries for all of the Debtors' stakeholders. However, as of the Petition Date, there are two pending lawsuits that will not only impede the Debtors' restructuring efforts but will also continue to drain the Debtors of what little cash they currently have to fund operations.

2.      One such litigation was initiated on December 20, 2023, in the Supreme Court of the State of New York (the "New York State Court"), by Invesco Senior Secured Management, Inc., which owns, manages, or sponsors a series of funds that have owned varying amounts of the Debtors' loans (collectively, "Invesco"). *See Invesco Senior Secured Mgmt., Inc v. Robertshaw US Holding Corp.*, et al., No. 656370/2023 (the "Invesco Action"). By its lawsuit, Invesco seeks to rescind the most recent amendment to the Debtors' credit agreement ("Amendment No. 5"), which imbued the Debtors with over $40 million of free cash to fund operations. In its place, Invesco seeks to reinstate a prior version of the credit agreement under which Invesco had temporarily amassed (by purchasing loans on the secondary market) enhanced voting and control rights. Invesco seeks this relief based on its allegation that it is still the "Required Lenders" under the Debtors' credit agreement, even though the Debtors already prepaid the majority of Invesco's loans (and the applicable "Prepayment Premium"), and even though the official register maintained by the administrative agent reflects that, since December 11, 2023, immediately following the prepayment, the Lender Plaintiffs constitute the "Required Lenders." The Invesco Action names as defendants Debtor Robertshaw as well as the Non-Debtor Parties. Robertshaw is contractually obligated to indemnify each of the Non-Debtor Parties for any damages and reasonable attorneys' fees incurred in connection with the Invesco Action.

3.      Putting aside the lack of merits of the Invesco Action, the claims asserted therein could potentially deplete the Debtors' estates. Indeed, if Invesco were granted its requested relief,

the Debtors would be stripped of over $40 million in working capital provided under Amendment No. 5.   Moreover, because of Robertshaw's indemnification obligation, any claim or final resolution against any of the Non-Debtor Parties in the Invesco Action would result in indemnification liability for the Debtors and indemnification claims asserted against the Debtors in these chapter 11 cases.

4.      In addition to the crippling financial impacts on the Debtors' estate,  any continued pursuit of the Invesco Action against the Non-Debtor Parties would violate the automatic stay. Invesco's claims for fraudulent conveyance are claims that, by virtue of the Debtors' commencement of these chapter 11 cases, belong solely to the Debtors as debtors-in-possession. More generally, continuation of the Invesco Action would implicate fundamental issues related to the Debtors' chapter 11 cases, including the Debtors' capital structure and credit agreements, as well as the nature, extent, and priority of claims against the Debtors, liens on the Debtors' assets, and the Debtors' obtaining post-petition credit.   The Invesco Action cannot proceed without potentially catastrophic impacts on the Debtors' efforts to reorganize before this Court.

5.      There is no debate that the automatic stay prevents continued prosecution of the Invesco Action against Debtor Robertshaw; to prevent Invesco from exercising control over property of the estate, the automatic stay likewise applies to the Non-Debtor Parties.  Accordingly, Robertshaw seeks an order declaring that the automatic stay applies to the claims asserted against the Non-Debtor Parties in the Invesco Action or that the automatic stay should be extended to such claims.  Any other result would impede these chapter 11 proceedings and allow Invesco to dissipate property of the Debtors' estate.

6.      The principal bases for the relief requested herein are sections 105(a) and 362(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules

7001(7), 7007 and 7065 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Rules 7007-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas ("Bankruptcy Local Rules"), and Procedures for Complex Cases in the Southern District of Texas.

7.      In support of this Motion, the Debtors rely on the *Declaration of Randall Eisenberg in Support of Debtors' Emergency Motion for Entry of an Order (A) Declaring That Automatic Stay Applies to Claims Asserted Against Non-Debtor Parties in Invesco Action or (B) Extending Automatic Stay and Preliminarily Enjoining Claims Against Non-Debtor Parties in Invesco Action* (the "Eisenberg Declaration"), to be filed in this Adversary Proceeding, as well as the *Declaration of John Hewitt in Support of Chapter 11 Petitions and First Day Pleadings* (the "Hewitt Declaration"), and the *Declaration of Stephen Spitzer in Support of Chapter 11 Petitions and First Day Pleadings* (the "Spitzer Declaration," and together with the Hewitt Declaration, the "First Day Declarations"), filed in these chapter 11 cases, each of which is fully incorporated herein by reference.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### A.      Overview of the Chapter 11 Cases

9.      Robertshaw is a global leader in designing and manufacturing innovative control systems and components for the appliance and HVAC industries.  Robertshaw operates on a worldwide scale, with a presence in key markets across North America, Europe, Asia, and Latin America.  Since Frederick W. Robertshaw invented an innovative home water heater thermostat

in 1899, Robertshaw has continued to pioneer cutting-edge technologies that enhance the functionality and sustainability of appliance, heating, ventilation, and air conditioning systems.

10.     On the date hereof (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") commencing cases for relief under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>").  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declarations.

11.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.  As of the date hereof, no trustee or examiner has been requested in these Chapter 11 Cases, and no committees have been appointed or designated.

12.     On the date hereof, the Debtors filed a motion with this Court pursuant to Bankruptcy Rule 1015(b) seeking joint administration of these cases and for consolidation for procedural purposes only.

### B.     The Relevant Loan Transactions

#### 1.     *The Super-Priority Credit Agreement*

13.     On May 9, 2023, Debtors Range Parent, Inc. ("<u>Range Parent</u>") and Robertshaw closed a series of financing transactions with certain lenders under their then-existing loan facilities (the "<u>May 2023 Transactions</u>").  The May 2023 Transactions provided the Debtors with $95 million in new money under a new Super-Priority Credit Agreement (the "<u>SPCA</u>").  Ex. 1, SPCA. The SPCA features separate loan tranches consisting of First-Out, Second-Out, Third-Out, Fourth-Out, and Fifth-Out Term Loans.

14.     Several provisions of the SPCA will feature prominently in these bankruptcy proceedings.  *First*, the SPCA permits the Debtors to prepay loans at any time subject to certain conditions.  Section 2.11(a)(i) of SPCA provides, in relevant part, that "[u]pon prior notice in accordance with [Section 2.11(a)(ii)], the [Debtors] shall have the right *at any time* and from time to time to prepay any [tranche] of Loans in whole or in part without premium or penalty (other than the Prepayment Premium [and other unapplicable fees])."  *Id.*, SPCA § 2.11(a)(i).

15.     *Second*, while the SPCA imposes restrictions on the amount of permitted debt, such restrictions are bounded.  Specifically, the SPCA provides that "[the Debtors] and each Subsidiary shall not, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness."  *Id.*, SPCA § 6.01.  Under the SPCA, an entity is a "Subsidiary" only if it is under voting control of the alleged parent.  Specifically, "Subsidiary" means:

> [an] entity of which more than 50.0% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person of a combination thereof.

*Id.*, SPCA § 1.01.

16.     *Third*, the SPCA, with certain limited exceptions not applicable here, permits provisions of the SPCA to "be waived, amended or modified . . . pursuant to an agreement or agreements in writing entered into by the [Debtors] and the Required Lenders."[4]  *Id.*, SPCA.

---

[4]  "Required Lenders" as defined in the SPCA means, "at any time, Lenders having [Super-Priority] Loans representing more than 50.0% of the sum of the total First-Out [Term Loans] and Second-Out [Term Loans] at such time."  *Id.*, SPCA.

2.    *Amendment Nos. 1 through 4 to the SPCA*

17.    Despite obtaining much needed capital from the May 2023 Transactions, by late summer of 2023, the Debtors once again faced a liquidity shortage requiring the Debtors to obtain additional financing.  During this same time frame, Invesco was busy secretly buying up the Debtors' loans on the open market in an effort to elevate itself to "Required Lenders" status.  By approximately early October 2023, Invesco had accomplished its goal.

18.    Once installed as the Required Lenders under the SPCA, Invesco and the Debtors entered into a series of amendments to the SPCA that, at a high level, extended the time for the Debtors to repay their existing ABL Facility in exchange for the Debtors' commitment to negotiate a new ABL facility with Invesco.  *See* Ex. 2, Amendment No. 1; Ex. 3, Amendment No. 2; Ex. 4, Amendment No. 3.  The last of these amendments, Amendment No. 4, was dated November 13, 2023, and followed just days after Amendment No. 3.  Ex. 5, Amendment No. 4.  But with Invesco threatening to declare an Event of Default, Robertshaw had no choice but to execute this further amendment, through which Invesco implemented its coercive plan to take control of the Debtors.

19.    Under Amendment 4, Invesco demanded certain milestones, each of which was designed to give Invesco (and only Invesco) control of the Debtors' eventual bankruptcy.  These milestones included:

(a)    the provision to Invesco by December 4, 2023, of a wind-down budget, sources and uses of cash attendant to a section 363 sale, a list of proposed critical vendor payments, a summary of executory contracts (and a proposed disposition of such contracts), and a proposal from AlixPartners to act as chief restructuring officer of the Company during the chapter 11 restructuring;

(b)    the negotiation and finalization of term sheets by December 8, 2023, for a debtor-in-possession financing facility and stalking horse asset purchase agreement with Invesco;

(c)    the execution of a stalking horse asset purchase agreement and debtor-in-possession credit agreement with Invesco by December 29, 2023; and

7

(d)     the filing of chapter 11 by January 2, 2024, with the stated goal of effectuating a sale under section 363 of the Bankruptcy Code within the timeframe allowed under the debtor-in-possession credit agreement.

20.     Like it had with prior amendments, Invesco intended to keep Amendment No. 4 a secret from the Lender Plaintiffs, and instructed Robertshaw not to disclose it to them and keep the imminent bankruptcy a secret.

21.     After entering Amendment No. 4, the Debtors, in consultation with their advisors, engaged in extensive, arm's-length negotiations with Invesco over the terms of a debtor-in-possession financing and stalking horse asset purchase agreement.  At the same time, the Debtors, as they were allowed to do, began exploring other financing opportunities that could afford the Company time to complete its turnaround efforts without immediately resorting to chapter 11.

### 3.     *The December 2023 Transactions*

22.     In December 2023, the Debtors—consistent with the exercise of their fiduciary duties—engaged in discussions with the Debtors' equity sponsor, ORC, and the Lender Plaintiffs regarding an alternative financing proposal to the one embodied in Amendment No. 4.  These negotiations resulted in a proposal that would yield a better outcome for all stakeholders and, on December 11, 2023, the Debtors entered into a series of transactions with ORC and the Lender Plaintiffs (the "December 2023 Transactions").

23.     The December 2023 Transactions involved six transactions.  *First*, Range Investor Holdings, LLC ("Investor Holdings") (the parent of Range Parent) formed a limited liability company called RS Funding Holdings, LLC ("RS Funding").  RS Funding was established with both voting and non-voting membership units (Class V and Class E units, respectively).  Investor Holdings held 100% of RS Funding's voting units giving it the sole power to direct or cause the direction of RS Funding's management and policies; Robertshaw held 100% of RS Funding's non-voting economic units, which carried no voting rights.  Because Robertshaw had no power to direct

8

or cause the direction of RS Funding's management and policies, RS Funding was not (and could not be) a "Subsidiary" of Robertshaw as defined under the SPCA.

24.     *Second*, after RS Funding was formed, the Lender Plaintiffs and One Rock agreed to jointly provide $228.3 million in fresh financing to RS Funding pursuant to a credit agreement dated December 11, 2023 (the "RS Funding Credit Agreement").

25.     *Third*, Investor Holdings, as the holder of 100% of the Class V voting units of RS Funding, instructed RS Funding to distribute the proceeds under the RS Funding Credit Agreement to Robertshaw.

26.     *Fourth,* Robertshaw used the contribution received from RS Funding to: (a) retire the $30 million ABL Facility; (b) prepay approximately $117.6 million in First-Out Term Loans under the SPCA, as allowed by Section 2.11; (c) pay approximately $30.7 million of Prepayment Premiums to the holders of First-Out Term Loans on account of the prepaid Loans; and (d) provide the Debtors with approximately $44 million in new liquidity.  Critically, this means that Robertshaw not only repaid Invesco substantially all of its principal, it paid Invesco over $25 million in Prepayment Premium—the agreed-upon compensation for early prepayment of the loans under the SPCA, and a massive return on Invesco's six-month investment.  As such, Invesco received every dollar to which it was contractually entitled.

27.     *Fifth*, following the prepayment in part of the First-Out Term Loans and the retirement of the ABL Facility, the Lender Plaintiffs became the "Required Lenders" under the SPCA.  This was confirmed by the official Register circulated by the administrative agent as of December 11, 2023.  Ex. 6, Register.  Thereafter, the Debtors and the Lender Plaintiffs (in their capacities as Required Lenders under the SPCA) entered into Amendment No. 5 to the SPCA

9

which, among other things, increased the Debtors' capacity to borrow additional First-Out and Second-Out Term Loans. Ex. 7, Amendment No. 5.

28.     *Finally*, the Debtors then issued approximately $228 million in incremental debt to the lenders under the SPCA, as set forth in Amendment No. 5—the proceeds of which were contributed by the Debtors to RS Funding and used to repay the loans under the RS Funding Credit Agreement. The December 2023 Transactions complied with the terms of the SPCA.

29.     As a result of the December 2023 Transactions, the Debtors were able to avoid a chapter 11 filing on January 2, 2024, and the subsequent rushed asset sale Invesco had been demanding under Amendment No. 4.[5] Furthermore, it was clear to the Debtors that, under the terms of Amendment No. 4, and given the subsequent negotiations with Invesco, Invesco intended to credit bid the entirety of its anticipated debtor-in-possession term loan and asset-based financing facility (which Invesco would have held on its own) and some part of its secured claim on account of the First-Out Term Loans without coming to consensus or resolution with other lenders in the capital structure.

30.     Under these conditions, the Debtors reasonably anticipated that any chapter 11 sale process would primarily benefit ***only*** Invesco and provide minimal (if any) returns to the Debtors' estates and other stakeholders. By contrast, the December 2023 Transactions provided the Debtors with $44 million in new liquidity. This substantial capital infusion gave the Debtors sufficient runway to execute upon and reap the benefits of their prepetition restructuring initiatives, thus potentially avoiding a future chapter 11 filing. The December 2023 Transactions also provided the Debtors additional time to market and negotiate the terms of a chapter 11 plan and commence

---

[5]     As stated above, Amendment No. 4 contemplated, among other things, an Invesco-mandated chapter 11 filing by January 2, 2024. *See* Ex. 5, Amendment No. 4.

a more orderly restructuring process, thereby providing the best possible opportunity for the Debtors to maximize value on behalf of *all* of their stakeholders.

### B.    The Invesco Action

31.    Unfortunately, nine days after the closing of the December 2023 Transactions, on December 20, 2023, Invesco (a) commenced the Invesco Action in the New York State Court against Debtor Robertshaw and the Non-Debtor Parties (ORC, the Lender Plaintiffs, and John Doe I) asserting the following claims and seeking the following relief:

| | Cause of Action | Defendants | Requested Relief |
|---|---|---|---|
| 1. | Breach of Contract | Robertshaw and the Lender Plaintiffs | Damages and voiding and unwinding of December 2023 Transactions |
| 2. | Breach of Implied Covenant of Good Faith and Fair Dealing | Robertshaw and the Lender Plaintiffs | Money damages and voiding and unwinding of December 2023 Transactions |
| 3. | Declaratory Judgment | Robertshaw and the Lender Plaintiffs | Declaration that December 2023 Transactions are void |
| 4. | Tortious Interference | ORC | Damages |
| 5. | Intentional Fraudulent Transfer | The Lender Plaintiffs and ORC | Voiding and unwinding of December 2023 Transactions |
| 6. | Constructive Fraudulent Transfer | The Lender Plaintiffs and ORC | Voiding and unwinding of December 2023 Transactions |
| 7. | Constructive Fraudulent Transfer | The Lender Plaintiffs and John Doe I | Voiding and unwinding of repayment of RS Funding |

32.    Invesco's prayer for relief in its complaint in the Invesco Action requests, among other things, that the New York State Court: (a) "[e]njoin any transactions, arrangements, amendments, variations, adjustments, compromises, waivers or settlements under or pursuant to the Loan Documents purportedly requiring only the consent, direction, or instruction of the [Lender Plaintiffs] and/or the Equity Sponsor [i.e., ORC], including but not limited to those in Amendment No. 5;" (b) "[o]rder Robertshaw to abide by the terms of Amendment No. 4 and

consummate the restructuring transaction contemplated therein;" and (c) "[o]rder money damages in an amount to be determined at trial."  Ex. 8, Invesco Compl. at 27-29.

33.     In seeking equitable relief to void and unwind the December 2023 Transactions, Invesco asserts that monetary damages would provide insufficient relief.  Specifically, Invesco argues that, if the December 2023 Transactions are not voided and unwound, it would "suffer irreparable harm by (a) losing voting control and consent rights over the Company's restructuring and (b) losing the benefits of Amendment No. 4, which proposed a restructuring transaction that offered Invesco a far better recovery than it stands to recover now." *See id.*, Compl. ¶ 57.  Invesco also argues it would suffer irreparable harm because it "is unlikely to receive any meaningful recovery on account of its subordinated debt owing by the indisputably insolvent Robertshaw [US] Holding." *Id.*

34.     On December 22, 2023, a hearing was conducted in the Invesco Action, following which Robertshaw, ORC, and each Lender Plaintiff, on the one hand, and Invesco, on the other hand, entered into a stipulation (the "Standstill Stipulation"), which was so-ordered by the State Court that same day.  Ex. 9, Dec. 22, 2023, Standstill Stipulation.  The parties then extended the Standstill Stipulation, which was again so-ordered by the Court on January 31, 2024.  Ex. 10, Jan. 31, 2024, Standstill Stipulation.  Under the Standstill Stipulation, Robertshaw covenanted not to, among other things, "engage in or make any transactions, arrangements, amendments, variations, adjustments, waivers, compromises, or settlements" under or pursuant to the SPCA and related loan documents that would require the consent or approval of the Required Lenders thereunder. Ex. 9 ¶ 2.  The parties also agreed to a mutually agreeable briefing schedule. *Id.*; Ex. 10.

35.     The Invesco Action is in its nascent stages.  Invesco and Robertshaw have exchanged document requests and made initial productions of materials, and the Debtors have

deposed two Invesco witnesses for the limited purpose of responding to Invesco's application for a preliminary injunction in the Invesco Action. But substantial work remains before a resolution on the merits—which is, at best, many months away.

### C.     The Debtors' Indemnification Obligations

36.     The SPCA provides, in relevant part, that the Debtors shall indemnify the Non-Debtor Parties for damages and expenses incurred in connection with the defense of the December 2023 Transactions.  Section 9.03(b) of the SPCA provides, in relevant part, that:

> The Borrowers[6] shall jointly and severally indemnify the Administrative Agent, each Lender, each member of the Ad Hoc Group . . . and each Related Party[7] of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all actual losses, claims, damages, liabilities and expenses (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole . . . incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) the use of the proceeds of the Loans, (iii) any actual or prospective claim, litigation, investigation or proceeding . . . relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by or against a third party or by or against the Borrowers, any other Loan Party, any Lender or any of their respective Affiliates), including in connection with any action, litigation or other dispute or proceeding related to the . . . Transactions (including any action, litigation or other dispute or proceeding

---

[6]     The SPCA defines "Borrowers" as each of the Debtors in these cases. Ex. 1, SPCA § 1.01.

[7]     "Related Parties" means "with respect to any specified Person, such Person's Affiliates and Approved Funds and their respective investment advisors, directors, officers, trustees, employees, agents, controlling persons, members, representatives and advisors of such Person, such Person's Affiliates and Approved Funds."  Ex. 1, SPCA § 1.01.  "Affiliate" means "as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person.  No Person shall be an 'Affiliate' solely because it is an unrelated portfolio company of a Sponsor and none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any Subsidiary thereof."  *Id.*

related to any temporary restraining order, preliminary injunction or any similar request for relief).

37.     The SPCA defines "Transaction" as:

> collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowing of Term Loans hereunder, (b) the European Debt Refinancing, (c) the execution, delivery and performance by the Loan Parties of the Existing Credit Agreement Amendments, (d) the execution, delivery and performance by the Loan Parties of the Intercreditor Agreements on the Closing Date, (e) the execution, delivery and performance by the Loan parties of the Exchange Documents and the related Exchange Transactions, and (f) the payment of the Transaction Costs.

Ex. 1, SPCA § 1.01.  Moreover, as defined in the SPCA, "Term Loan" encompasses the loans extended by the Lender Plaintiffs as part of the December 2023 Transactions.  *Id.*

38.     The Lender Plaintiffs and ORC each qualify as Indemnitees under the SPCA, and the Debtors are obligated to indemnify each for the claims in the Invesco Action.

## <u>ARGUMENT</u>

**I.     THE AUTOMATIC STAY APPLIES TO CLAIMS AGAINST THE NON-DEBTOR PARTIES IN THE INVESCO ACTION BECAUSE THE CLAIMS ASSERTED ARE PROPERTY OF THE ESTATE OR SEEK TO EXERCISE CONTROL OVER PROPERTY OF THE ESTATE**

39.     "The section 362(a)(3) stay applies to two types of claims: claims that belong to the debtor under applicable state (or federal) law, and claims that seek to recover property of the estate that is controlled by a person or entity other than debtor."  *Highland Cap. Mgmt. LP, et al. v. Chesapeake Energy Corp., et al. (In re Seven Seas Petroleum)*, 522 F.3d 575, 588 (5th Cir. 2008).  The Invesco Action asserts both claims belonging to the Debtors' estates and claims seeking to recover property of the Debtors' estates.  Thus, as further explained below, the Invesco Action is automatically stayed pursuant to section 362(a)(3).

14

A. **Bankruptcy Code Section 362(a)(3) Stays All Claims in the Invesco Action Seeking to Void the Debtors' Property Interests under Amendment No. 5**

40.     The United States Supreme Court has interpreted section 362(a)(3) as a "prohibit[ion of] affirmative acts that would *disturb the status quo* of estate property as of the time when the bankruptcy petition was filed." *City of Chicago, Ill. v. Fulton*, 592 U.S. 154, 158 (2021). "Section 362(a)(3) thus implements a stay of any action, whether against the debtor or third parties, that seeks to obtain or exercise control over the property of the debtor." *In re S.I. Acquisition, Inc.* 817 F.2d 1142, 1148 (5th Cir. 1987).

41.     Courts have routinely found that "exercising control" includes acts that would interfere with the debtor's enjoyment of its property or that would destroy the property. *See Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997) ("[A]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the debtor must be barred by the automatic stay provision."); *see also In re Windstream Holdings, Inc*., 627 B.R. 32, 43 (Bankr. S.D.N.Y. 2021), vacated in part, 634 F. Supp. 3d 99 (S.D.N.Y. 2022) ("[S]ection 362(a)(3) stays acts that impair, interfere with or destroy the estate's interest in contracts or goodwill."); *Fulton*, 592 U.S. at 161 ("[T]he stay [applies] to acts that would change the status quo with respect to intangible property and acts that would change the status quo with respect to tangible property without 'obtaining' such property.").

42.     It is well settled that a debtor's contract rights are property of the estate and thus protected by the automatic stay. *In re Jackson*, No. 06-36268 2012 WL 3071218, at *31 (Bankr. S.D. Tex. July 27, 2012) ("It is black letter law that a Debtor's rights under an executory contract constitute property of the estate."); *see In re Boates*, 554 B.R. 472, 474 (B.A.P. 9th Cir. 2016) ("Contract rights held by the debtor on the date of his or her petition filing are property of the bankruptcy estate regardless of whether the rights are associated with an executory or non-

executory contract."); *see also Bonnevill Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 252 (5th Cir. 2006) (holding that the debtor's interest in a contract "became property of the [debtor's] estate" on the petition date); 11 U.S.C. § 541 (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case").  This principle holds true even in litigation between non-debtors, when granting the relief sought would result in the rescission of a contract with the debtor, and thus impermissibly interfere with the debtor's contract rights.  *See* Ex. 11, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico, as representative of Puerto Rico Highways and Transp. Auth.*, No. 17-bk-3567-LTS (Dist. Puerto Rico), Dkt. 845 (holding that litigation between two non-debtors that would result in rescinding a contract between one litigant and a debtor would violate section 362(a)(3), despite the debtor not being a party to the litigation, because it would require the debtor to unwind a contract).

43.     Furthermore, the stay applies even in the face of challenges to the validity of those contracts.  *Brown, et al. v. Chesnut (In re Chesnut)*, 422 F.3d 298, 300 (5th Cir. 2005) ("Here we face the question of whether the creditor violates the stay if without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only **an arguable claim of right** . . . . We answer in the affirmative."); *see also Stoker v. Aurora Loan Servs. Inc., et al.*, No. 09-33976, 2010 WL 958030, at *4 (Bankr. S.D. Tex. March 10, 2010) (Isgur, J.) ("*Chesnut* holds that the automatic stay . . . applies to property that is *arguably* property of the estate.") (emphasis in original).

44.     In light of the foregoing, section 362(a)(3) bars continuation of the Invesco Action because that Action seeks to destroy or take dominion over estate property even if the Action continued only against the Non-Debtor Parties.  The December 2023 Transactions, which are the subject of dispute in the Invesco Action, bestowed critical assets and benefits on the Debtors in the form of a new, preferred, and more flexible capital structure:  new money and fresh liquidity,

16

new controlling lenders, less restrictive covenants, and freedom from Invesco's ill-exerted leverage.  *See* Ex. 7, Amendment No. 5 § 6(b); Ex. 1, SPCA §§ 1.01, 9.05(f).  They are contract rights of the Debtors and are therefore covered by section 362(a)(3)—even if Invesco seeks to dispute their validity.  *In re Jackson,* 2012 WL 3071218, at *31 (applying automatic stay to contract rights); *In re Chestnut*, 422 F.3d at 300 (finding the automatic stay applies even to arguable claims of right).

45.     The Invesco Action, at its core, seeks to *void* Amendment No. 5 and *unwind* the December 2023 Transactions.  For example, the first, second, and third causes of action asserted in the Invesco Action allege that money damages are insufficient to compensate Invesco for its loss of control over the Debtors' restructuring and, therefore, Invesco seeks equitable relief in the form of voiding (or, in the case of the third cause of action, declaring void) Amendment No. 5. *See* Ex. 8, Invesco Compl. ¶¶ 57, 64, 74.  Similarly, Invesco's fifth, sixth, and seventh causes of actions, which are asserted against only the Non-Debtor Parties, seek, as the sole form of relief, to void and unwind the December 2023 Transactions.  *See Id.*, Invesco Compl. ¶¶ 93, 101, 110.

46.     Notably, whether the Invesco Action proceeds against all defendants or just the Non-Debtor Parties, the requested relief is the same.  Indeed, Invesco's asserted causes of action against the Non-Debtor Parties, and the related prayers for relief, if granted, would result in the rescission of Amendment No. 5 and the reinstatement of Invesco's Amendment No. 4[8]—an impermissible intrusion on the Debtors' sacrosanct contract rights.  To the extent such relief was feasible (and at this late date it is not), the fact remains that the real harm would not be felt by the Non-Debtor Parties, but instead by the Debtors, which would be forced into a different credit

---

[8]  Invesco's application for a preliminary injunction seeks the same equitable relief and therefore is, along with all discovery and briefing, likewise automatically stayed.

agreement with a different lender, Invesco.  *See Aimco CLO 10 Ltd v. Revlon, Inc. (In re Revlon Inc.)*, No. 22-01167, 2023 WL 2229352, at *13 (Bankr. S.D.N.Y. Feb. 24, 2023) (finding that an action to unwind the debtor's prepetition liability management transaction must be stayed because the equitable relief sought would "fundamentally chang[e] Debtors' rights and obligations under their most important financing arrangements").  Worse still, it is now clear that Invesco is determined in these chapter 11 cases to destroy value for every stakeholder other than itself.

47.    In its complaint, Invesco makes explicit that the purpose of the Invesco Action is to restore Invesco's ability to wield control over the Debtors.  Indeed, while describing the "Nature of the Case," Invesco proclaims that its "action seeks to rescind [the December 2023 Transactions] as a breach of the [SPCA]" and "seeks immediate injunctive relief to ensure that Invesco retains the voting control and consent rights it bargained for and the right and ability to pursue the restructuring it negotiated with the [Debtors]."  Ex. 8, Invesco Compl. ¶ 6.  Such relief is flatly inconsistent with the Bankruptcy Code and governing case law that prohibit actions to interfere with estate property.  *See, e.g.*, *Fulton*, 592 U.S. at 161 ("[T]he 1984 amendment [to section 362(a)(3)] . . . extended the stay to acts that would change the status quo . . ..")

**B.    Bankruptcy Code Section 362(a)(3) Stays the Fraudulent Transfer Claims Asserted in the Invesco Action Because Such Claims Belong to the Debtors' Estates**

48.    Fifth Circuit precedent holds that section 362(a)(3) of the Bankruptcy Code automatically stays causes of action asserted by a third party against a non-debtor if that cause of action belongs to the debtor's estate.  *See S.I. Acquisition*, 817 F.2d at 1150 ("a section 362(a)(3) stay applies to a cause of action that under state (or federal) law belongs to the debtor").  The Fifth Circuit has established that fraudulent conveyance actions belong to the debtor's estate because the equitable interest in the transferred property "remain[s] in the debtor," and that, although creditors may bring fraudulent transfer actions outside of bankruptcy, the action "passes to the

trustee, who is then charged with prosecuting it for the benefit of all creditors and shareholders." *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275, 77 (5th Cir. 1983). While the decision in *MortgageAmerica* applies the Texas Fraudulent Transfers Act, courts have routinely held that fraudulent transfer actions under New York and Delaware law belong to the debtor's estate after the petition date. *See, e.g., In re AP Indus., Inc.*, 117 B.R. 789, 799 (Bankr. S.D.N.Y. 1990); *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 2021 WL 710816, at *13 (Del. Super. Ct. Feb. 23, 2021) ("Any recoveries [from the fraudulent transfer claims] will be property of the estate . . . . [T]he distribution of those funds would be a distribution or payment 'by or on behalf of the Company.'"); *accord In re Wilton Armetale, Inc.*, 968 F.3d at 284 ("[T]he Bankruptcy Code makes a creditor's derivative claims property of the estate. From there, the trustee decides how best to manage them for the benefit of all creditors.")[9]

49.    Invesco's fifth, sixth, and seventh causes of action in the Invesco Complaint consist of fraudulent transfer claims under "applicable law, including but not limited to 6 Del. Code Ann. § 1304 and N.Y. Debt & Cred. Law § 273," and generally allege that the Debtors' granting of liens, incurring indebtedness, and repaying the RS Funding constituted a fraudulent transfer. *See* Ex. 8, Invesco Compl. at 23-27. Accordingly, these fraudulent transfer claims belong to the Debtors' estates and may only be asserted by the Debtors as debtors in possession pursuant to section 544 of the Bankruptcy Code. For this reason, those three causes of action are automatically stayed under section 362(a)(3) because the claims themselves constitute estate property.

---

[9]    Moreover, the Fifth Circuit views fraudulent transfer claims themselves, not merely the proceeds of such claims, as property of the estate such that a trustee can sell such claims. *See The Cadle Co. v. Mims, et al. (In re Moore)*, 608 F.3d 253, 262 (5th Cir. 2010) (We conclude, therefore, that the fraudulent-transfer claims are property of the estate . . . and—like other estate property—may be sold pursuant to § 363(b).").

## II.    IN THE ALTERNATIVE, THE AUTOMATIC STAY SHOULD BE EXTENDED TO CLAIMS AGAINST THE NON-DEBTOR PARTIES IN THE INVESCO ACTION BECAUSE ANY JUDGMENT AGAINST THE NON-DEBTOR PARTIES IS EFFECTIVELY A JUDGMENT AGAINST THE DEBTORS

50.    Even if section 362(a)(3) of the Bankruptcy Code did not automatically stay the Invesco Action against the Non-Debtor Parties (and it does), including any claims for money damages, the Court "may invoke [section] 362 to stay proceedings against nonbankrupt defendants where such identity between the debtor and the third-party defendant exists that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001); *see also Reliant Energy Servs, Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (same).

51.    Here, the Debtors are the "real party defendant," and failing to extend the stay to the Non-Debtor Parties would impede the Debtor's reorganization efforts for at least three reasons. **First**, Invesco has alleged "inextricably interwoven" claims against the Debtors and the Non-Debtor Parties that present "common questions of law and fact." *See In re Fed. Life Ins. (Mut.) v. First Fin. Grp. of Tex., Inc.*, 3 B.R. 375, 376-77 (S.D. Tex. 1980). All of Invesco's claims arise out of the December 2023 Transactions and fundamentally rely, at least in part, on allegations that the **Debtors** performed certain actions that the **Debtors** were not permitted to perform. A review of each claim makes this apparent:

>    (a)    Count I.  Alleges that Robertshaw and the Ad Hoc Group breached (i) the **Debtors'** obligation not to incur additional debt (Ex. 1, SPCA § 6.01) because the **Debtors** incurred additional debt, and (ii) prohibitions on amending certain provisions (SPCA §§ 9.02(b)(A)(9), 9.02(b)(C)(1)) because the Ad Hoc Group **and the Debtors** amended those provisions by agreement. Ex. 8, Invesco Compl. ¶ 55.

>    (b)    Count II.  Alleges that Robertshaw and the Ad Hoc Group breached the implied covenant of good faith and fair dealing by consummating the

December 2023 Transactions and by the ***Debtors'*** partial prepayment of First-Out Loans. *Id.* at ¶¶ 60-63.

(c)   Count III.  In claiming that a declaratory judgment is warranted against Robertshaw and the Ad Hoc Group for Counts I and II, alleges that the December 2023 Transactions, including the ***Debtors' prepayment and incurrence*** of new debt, "were interwoven, interdependent, involve and were executed by substantially the same parties, and were designed to effectuate one purpose." *Id.* at ¶ 69.

(d)   Count IV.  Alleges that ORC tortiously interfered with the SPCA by causing the ***Debtors*** to breach the SPCA. *Id.* at ¶ 80.

(e)   Counts V, VI, and VII.  Alleges that the ***Debtors***, either with the intent to hinder, delay, or defraud their creditors, or otherwise without receiving reasonably equivalent value, transferred liens, contractual rights, and an "equity contribution" to the Non-Debtor Parties resulting in a  fraudulent transfer. *Id.* at ¶¶ 84, 86, 99, 108.

Each of Invesco's claims relies on allegations that the ***Debtors*** performed some prohibited action in connection with their participation in the December 2023 Transactions.  Even the tortious interference claim asserted against only ORC requires Invesco to demonstrate that the ***Debtors*** breached the SPCA. *See Jack L. Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 1080 (1977) ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party.").  Where, as here, the claims against the Debtors and the Non-Debtor Parties are thoroughly interwoven and hinge on the conduct of the Debtors, "a judgment against [the Non-Debtor Parties] will in effect be a judgment or finding against [the Debtors]" and must be stayed. *See Garlock*, 278 F.3d at 436.

52.   ***Second***, as noted above, the Debtors owe the Non-Debtor Parties contractual indemnity.  As stated by the Fourth Circuit in *A.H. Robins Co., Inc.*, and recognized by the Fifth Circuit, "an illustration of [unusual circumstances creating identity of interest] would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994,

999 (4th Cir. 1986); *see also Reliant Energy*, 349 F.3d at 825 (acknowledging the Fifth Circuit recognizes the *A.H. Robins* exception in *Garlock*, 278 F.3d at 436).  In such a case, "when the liability of the nonbankrupt is not independent of the debtor's liability and a judgment against the nonbankrupt will be binding upon the debtor's estate, the stay protection must be extended to encompass actions against the nonbankrupt." *S.I. Acquisition*, 817 F.2d at 1148 (citing *A.H. Robins*, 788 F.2d at 999).

53.     Here, as noted, the SPCA requires the Debtors to jointly and severally indemnify the Non-Debtor Parties against "any and all actual losses, claims, damages, liabilities and expenses" arising out of, in connection with, or as a result of the SPCA and the transactions contemplated thereby (including the December 2023 Transactions).  *See* Ex. 1, SPCA § 9.03(b). Thus, any judgment awarded against the Non-Debtor Parties in the Invesco Action risks the imposition of joint and several liability, equal to the amount awarded (plus more for fees and costs), on each of the Debtors.  In other words, even if there were some substantive differences between the claims asserted against the Debtors and the Non-Debtor Parties (there is none), a judgment against the Non-Debtor Parties would still "in effect be a judgment or finding against the [Debtors]" establishing indemnification liability.  *Garlock, Inc.*, 278 F.3d at 436.  This is exactly the type of situation where "[t]o refuse application of the statutory stay . . . would defeat the very purpose and intent of the statute." *A.H. Robins*, 788 F.2d at 999.[10]

54.     ***Third***, for the same reasons discussed with regard to section 362(a)(3), a judgment against the Non-Debtor Parties that awards the equitable remedies that Invesco seeks will also ***literally*** be a judgment against the Debtors.  An order to void, rescind, or otherwise substantively

---

[10]    To the extent that the Debtors would not be required to perform their indemnification obligations under the SPCA, the Non-Debtor Parties will be prejudiced by having litigated and suffered a judgment for which they are entitled to indemnification, but which the Debtors need not recognize. *See A.H. Robins*, 788 F.3d at 1000.

modify the December 2023 Transactions and Amendment No. 5 would void the **Debtors' contracts** and refashion the **Debtors' capital structure**.  Determining the Debtors' capital structure is a critical step in moving forward efficiently with the Debtors' reorganization, and any further prosecution of the Invesco Action would inevitably derail the proceedings in front of this Court. *See* Section III.B-C, *infra*.  Under these circumstances, any continuation of the Invesco Action would risk—in fact, seek—a judgment against the Debtors.  *Arnold*, 278 F.3d at 436; *see also* Ex. 12, Hr'g Tr. 60:11-14, *Serta Simmons Bedding LLC*, No. 23-03007 (Bankr. S.D. Tex. Mar. 13, 2023) (extending the automatic stay because "a negative finding that could get made [in the state court actions] would have a negative impact on the debtor, and . . . conclud[ing] that there is an identity of interests [between the debtors and non-debtors]").

55.    Accordingly, the Court should extend the automatic stay under section 362(a)(1) of the Bankruptcy Code to any claims against the Non-Debtor Parties in the Invesco Action to the extent such claims are not otherwise automatically stayed.

## III.    ALTERNATIVELY, THE COURT SHOULD EXERCISE ITS EQUITABLE POWERS TO STAY THE INVESCO ACTION AGAINST THE NON-DEBTOR PARTIES

56.    The Fifth Circuit recognizes that, "beyond the automatic stay provisions of section 362(a)(1) and (3), the bankruptcy court may affirmatively stay proceedings pursuant to its broad discretionary powers embodied in" section 105, including the power "to stay proceedings against nonbankrupt entities."  *S.I. Acquisition*, 817 F.2d at 1146 n.3 (citing *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983)); *In re Continental Air Lines, Inc.*, 61 B.R. 758, 781 (S.D. Tex. 1986) (stating that section 105(a) provides a "statutory basis for issuance of a stay against a debtor's codefendants"); *In re OGA Charters, LLC*, 554 B.R. 415, 424 (S.D. Tex. 2016) ("Some courts have found that the use of § 105 to issue an injunction is, in effect, merely an extension of the automatic stay in situations where non-debtor co-defendants require the protection of the

23

bankruptcy court."). Courts regularly find it appropriate to stay actions against non-debtor defendants pursuant to section 105(a) when the action "will have an adverse impact on the debtor's ability to accomplish reorganization." *In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995).

57. Granting equitable relief pursuant to section 105(a) of the Bankruptcy Code requires the Court to "consider the traditional factors governing preliminary injunctions issued pursuant to Federal Rule of Civil Procedure 65." *Id.* at 765. "The four prerequisites to the issuance of a preliminary injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest." *In re Commonwealth Oil Refining Co., Inc.*, 805 F.2d 1175, 1189 (5th Cir. 1986).

A.    **Debtor Robertshaw Is Likely to Succeed on the Merits in the Adversary Proceeding**

58. This first prong asks whether Robertshaw "will prevail on the merits in the [c]omplaint in this adversary proceeding." *In re Chiron Equities, LLC*, 552 B.R. 674, 695 (Bankr. S.D. Tex. 2016). Debtors need "not demonstrate [they] [are] certain to win," but need "only to present a *prima facie* case." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011). "It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* (quoting *Sebastian v. Tex. Dept. of Corrections*, 541 F. Supp. 970, 975 (S.D. Tex. 1982).

59. There is a substantial likelihood that Robertshaw will prevail on the merits here.

1.     *The December 2023 Transactions Did Not Breach the SPCA*

60.     Amendment No. 5 was permitted under the unambiguous terms of the SPCA.  And under New York law, when the terms of a contract are unambiguous, they must govern the parties' conduct as written.  *See Wachtel v. Park Ave & 84th St., Inc*., 180 A.D.3d 545, 547 (N.Y. App. Div. 1st Dep't 2020) (dismissing breach of contract claim where "allegations [were] conclusively refuted by the unambiguous [contract] language").

61.     The SPCA only prohibits the incurrence of additional Indebtedness by the Borrower or a Subsidiary, and only entities over which Robertshaw holds voting control qualify as Subsidiaries.  RS Funding, the entity that raised the capital to prepay Invesco's First-Out Term Loans, was not an entity over which Robertshaw held voting control.  Moreover, the SPCA allowed Robertshaw to prepay Invesco's First-Out Loans "at any time and from time to time . . . in whole or in part without premium or penalty (other than the Prepayment Premium [and other unapplicable fees])." Ex. 1, SPCA § 2.11(a)(i).  There is no dispute that Robertshaw paid Invesco the applicable Prepayment Premium.  While Invesco may be unhappy that the December 2023 Transactions scuttled its plans to reap a windfall at the expense of other stakeholders, the fact remains that the December 2023 Transactions strictly complied with the terms of the SPCA.

62.     The arguments advanced by Invesco to the New York State Court are unavailing. Invesco first argues that the December 2023 Transactions violated Section 6.01 because it says the Debtors cannot directly or indirectly incur Indebtedness.  But the December 2023 Transactions were approved by the Lender Plaintiffs, *as the Required Lenders*, and therefore had the power to either consent to the incurrence of new indebtedness under Section 6.01 or waive any breach after-the-fact.  Ex. 1, SPCA § 6.01.  And in any event, it was RS Funding, an entity that Robertshaw had no power to control, that incurred the indebtedness

63.     Second, Invesco alleges a violation of Section 9.02(b)(A)(9), which prohibits agreements between Required Lenders and the Borrower that would authorize "additional Indebtedness that would be issued under the Loan Documents for the purpose of influencing the voting threshold."  This argument fails in the first instance because the RS Funding Credit Agreement was not an agreement between Required Lenders and the Borrower.  Moreover, the Debtors did not incur ***additional Indebtedness under the Loan Documents*** prior to the Lender Plaintiffs becoming Required Lenders as a result of the prepayment of loans.  Nor is this merely semantics—simply generating more debt would leave the impaired lender holding the same debt while simultaneously losing its voting power.  Here, Invesco was ***repaid***.

64.     Finally, Invesco points to an alleged violation of Section 9.02(b)(C)(1).  Section 9.02(b)(C)(1) says that no agreement, shall without obtaining consent of lenders owning 75% of the sum of the First-Out Loans and Second-Out Term Loans, "subordinate the Term Facility to any other Indebtedness."  Ex. 1, SPCA § 9.02(b)(C)(1).  Here, no consent of lenders owning 75% of the sum of the First-Out and Second-Out Term Loans was required because the Debtors did not subordinate the Term Facility.  The Debtors issued new incremental First- and Second-Out Term Loans under the existing SPCA, which requires only Required Lenders consent.  In fact, Invesco itself exercised this power in Amendment No. 2—when it help Required Lenders status—when it extended a $17 million "bridge loan" in the form of "incremental" First-Out Term Loans without the support of lenders owning 75% of the sum of the First-Out and Second-Out Term Loans.  *See* Ex. 3, Amendment No. 2.

> **2.     *The December 2023 Transactions Did Not Breach the Implied Covenant of Good Faith and Fair Dealing***

65.     Since the Transactions were expressly permitted under the terms of the contract, any implied covenant claim must also fail as a matter of law.  *See Fesseha v. TD Waterhouse Inv'r*

*Servs., Inc.*, 305 A.D.2d 268, 268 (N.Y. App. Div. 1st Dep't. 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."); *Maxon Int'l Inc. v. Int'l Harvester Co.*, 82 A.D.2d 1006, 1007 (N.Y. App. Div. 3d Dep't 1981) (same), aff'd, 56 N.Y.2d 879 (1982). And this makes sense, as an implied covenant claim cannot be used to "imply obligations inconsistent with contractual provisions," *Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*, 84 A.D.3d 439, 439 (N.Y. App. Div. 1st Dep't 2011), or to add new terms to the contract, *Brown v. Deutsche Bank Nat'l Tr. Co.*, 120 A.D.3d 440, 441 (N.Y. App. Div. 1st Dep't 2014). Here, because the Transactions were permitted under the plain terms of the SPCA, any implied covenant claim must also fail.

66.     Additionally, New York law expressly holds that where, as here, the "good faith claim arises from the same facts and seeks the same damages as a breach of contract claim, it should be dismissed." *Mill Fin., LLC v. Gillet*, 122 A.D.3d 98, 104 (N.Y. App. Div. 1st Dep't 2014).

### 3.     *The Equities Weigh Against Invesco*

67.     Ultimately, Invesco complains not that the SPCA prohibited the December 2023 Transactions by its plain terms, but that the Debtors made unfair use of the flexibility embodied in those terms. But Invesco's dissatisfaction that the Lender Defendants and ORC came forward with a better proposal—that complied with the terms of the SPCA—is no basis on which to grant Invesco relief, particularly when Invesco has done the same previously.

68.     Invesco is a sophisticated investor in corporate debt, and it demonstrably knows how to read complex debt documents, understand the flexibility they provide to borrowers, and to capitalize on that flexibility when it suits them. Invesco should not be heard to complain about alleged loopholes in the SPCA that it believes distorted the spirit of the contract when Invesco

itself previously took advantage of similar provisions in the SPCA to seize control of the Debtors and attempt to force them into a bankruptcy that would have destroyed value for all stakeholders other than Invesco.  Ex. 13, Memorandum Opinion, *In re Serta Simmons Bedding, LLC, et al.*, No. 23-90020, Dkt. 324 (Bankr. S.D. Tex. June 6, 2023) (finding that parties to the credit agreement understood the nature of the "loose" document, that the Objecting Lenders acquired a majority of their loan holdings in anticipation of excluding certain lenders, which is exactly what the Objecting Lenders complain was done to them using the same provisions of the credit agreement, and finding both no evidence of a breach in the credit agreement and that there was no evidence of improper motive of the Debtors and non-debtor defendant lenders did not breach an implied duty of good faith and fair dealing).

### B.     The Debtors Will Be Irreparably Harmed Without a Stay

69.     A debtor satisfies the requirement of irreparable harm where it will suffer an actual and imminent, rather than speculative and remote, injury for which there is no adequate remedy at law.  *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).  But "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'"  *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).  "A recognized exception to the general rule that damages cannot be compensable in monetary relief is where the potential economic loss is so great as to threaten the existence of the movant's business."  *Allied Home*, 830 F. Supp. 2d at 228.

70.     Both the Restructuring Support Agreement (the "RSA") and the proposed super-priority senior secured debtor-in-possession term loan credit facility in the aggregate amount of $56,000,000 (the "DIP Facility") are essential to the success of these Chapter 11 Cases, and an adverse ruling in the Invesco Action would trigger an event of default under both agreements.  See RSA § 7.02(n); DIP Credit Agreement § 7.01(i).  More fundamentally, the adverse ruling that

28

Invesco seeks, if granted, would eliminate and replace the capital structure underlying the Debtors' key agreements. It is unclear how these chapter 11 cases would proceed in the face of such a ruling. Thus, the consequences of an adverse ruling against the Non-Debtor Parties would be so devastating to the Debtors' reorganization efforts that the Debtors will be required to divert a substantial amount of attention and resources away from these Chapter 11 Cases toward defending, even if indirectly, against Invesco's claims should the Invesco Action continue. *See A.H. Robins*, 788 F.2d at 1003 (finding the court may exercise authority under Section 105 to enjoin a proceeding that would have an adverse effect on the ability of the debtor to reorganize of formulate a plan).

71.     Even if the Invesco Action did not pose such a substantial threat to the Debtors' ability to reorganize, the Debtors are so inseparable from Invesco's allegations that continuation of the litigation would still distract the Debtors' management team and divert time and resources away from the Debtors' restructuring efforts and toward time-consuming responses to third-party discovery requests, depositions, and dispositive motion practice. That harm would threaten the Debtors' ability to efficiently conduct these cases. *See Chiron Equities*, 552 B.R. at 699; *In Re Hunt*, 93 B.R. 484, 495-96 (Bankr. N.D. Tex. 1988) (concluding that litigation costs, the diversion of attention from chapter 11 cases, and the inability to effectively manage reorganization efforts must be considered as elements of harm).

**C.     The Balance of Harms Substantially Weighs in the Debtors' Favor**

72.     The third factor, that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction, "requires this Court to essentially balance the equities between the opposing parties." *Chiron Equities*, 552 B.R. at 700 (citing *DSC Commc'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996)). The balance of equities tips in favor of the Debtors because Invesco would suffer no hardship from staying the Invesco

Action.  The Debtors have commenced the instant adversary proceeding to resolve the issues that Invesco asserted in the Invesco Action, which means that Invesco's claims will be adjudicated expeditiously in the context of these Chapter 11 Cases on what will likely be a substantially shorter timeline than in the State Court.  While Invesco may prefer to remain in the State Court, it cannot plausibly allege it is prejudiced by having the dispute instead before this Court.  Indeed, this Court is well suited to efficiently resolve the issues in the Invesco Action, which involves fundamental bankruptcy issues—the Debtors' capital structure and credit agreements, and the nature, extent, and priority of claims against the Debtors.  Not only are these key issues that cannot be litigated and decided in another court during the pendency of these Chapter 11 Cases, they are issues that bankruptcy courts confront every day.  Given the Debtors' commitment to resolve the dispute that is the subject of the stayed action, the stay causes Invesco no prejudice.

73.      It also is not possible to defer the instant restructuring to await the outcome of the Invesco Action.  The Debtors do not have the time or resources to await the outcome of the Invesco Action on an unknown timeline.  Indeed, cases similar to this one pending before the New York Commercial Division have taken roughly a year or more to simply reach the motion to dismiss phase.  For example, in *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, a dispute over an uptier transaction, the New York Commercial Division resolved the parties' motions to dismiss more than a year after the action was commenced.  150 N.Y.S.3d 894 (N.Y. Sup. Ct. Aug. 16, 2021) (resolving the parties' motion to dismiss on August 16, 2021 in an action filed on November 7, 2020).  Similarly, in *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, the New York Commercial Division did not resolve the parties' motions to dismiss until more than two years from the action's filing.  2022 WL 10085886, at *10 (N.Y. Sup. Oct. 17, 2022) (ruling on the parties' motions to dismiss on October 17, 2022 in an action filed on October 9, 2020).

Appeals, including interlocutory appeals which are permitted under New York's Civil Practice Law and Rules, can further prolong the time parties must spend before the State Court: in *Eaton Vance Management v. Wilmington Sav. Fund Soc., FSB*, the Commercial Division ruled on the parties' motions to dismiss after the action had been pending for 10 months.  2018 WL 1947405, at *3 (N.Y. Sup. Apr. 25, 2018) (ruling on motions to dismiss on April 25, 2018, in an action filed on June 22, 2017), affirmed by *Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc'y, FSB*, 171 A.D.3d 626 (N.Y. App. Div. 2019).  An appeal followed, which was resolved one year following the Commercial Division's ruling on the motion to dismiss.  *Eaton Vance Mgmt.*, 171 A.D.3d at 626 (N.Y. App. Div. 2019) (resolving an appeal from an April 25, 2018, ruling on a motion to dismiss on April 25, 2019).  The Debtors do not have the resources to continue these Chapter 11 Cases—or to defer their commencement—on anything approaching the timelines of these typical state court cases.

        **D.**      **The Public Interest Weighs in the Debtors' Favor**

74.      The public interest in efficient reorganization requires the disputes over the Debtors' capital structure to be adjudicated in a single court: this Court.  Indeed, "[i]n the bankruptcy context, the relevant public interest is the interest in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public."  *In Re Caesars Ent. Operating Co.*, 561 B.R. 441, 453 (Bankr. N.D. Ill. 2016); *see OGA Charters*, 554 B.R. at 426 (holding an injunction to be in the public interest because "the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate").  To move efficiently through the reorganization process (and, in doing so, maximize creditors' recoveries), the Debtors need to focus their time, resources, and funds on these Chapter 11 Cases.  The automatic stay is a fundamental protection that allows debtors to do just that. Enforcing the automatic stay against the

Non-Debtor Parties would enable the Debtors to maximize the value of their estates and focus on successfully reorganizing in chapter 11; two paramount goals of the Bankruptcy Code which are in the public interest. *See OGA Charters*, 554 B.R. at 426 (finding "that public interest may be served where the purpose of the preliminary injunction is such that it serves to uphold the twin pillars of bankruptcy"). Application of the stay is particularly necessary here because, as discussed above*,* the Debtors and Non-Debtor Parties anticipate that the Invesco Action will destroy the value of the Debtors' estates and hinder the Debtors' reorganization efforts.

## EMERGENCY CONSIDERATION

75.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1(i). The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of operations and the success of these Chapter 11 Cases. As discussed in detail above and in the First Day Declarations, immediate and irreparable harm would result if the relief requested herein is not granted. Failure to obtain the requested relief at the outset of these Chapter 11 Cases would imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the standard of Bankruptcy Local Rule 9013-1(i) and, therefore, respectfully request that the Court approve the relief on an emergency basis.

## RESERVATION OF RIGHTS

76.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an impairment or waiver of any Debtor's or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication or admission that any particular claim is of a type specified or defined in

the Motion, or any order granting the relief requested by the Motion; (f) an implication, admission, or finding as to the validity, enforceability, or perfection of any interest or encumbrance on the property of any Debtor or its estate; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of any Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## NOTICE

77.     Notice of this Motion will be given to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to ORC; (d) counsel to the Ad Hoc Group; (e) counsel to Invesco; (f) counsel to the Guardian Plaintiffs; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the state attorneys general for states in which the Debtors conduct business; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

78.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing Agent, Kroll Restructuring Administration LLC, at https://cases.ra.kroll.com/Robertshaw/.

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed Order, granting the relief requested in this Motion and any such other and further relief as may be just and proper.

Dated: February 15, 2024

*/s/ Timothy A. Davidson II*_____
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email:  taddavidson@HuntonAK.com
        ashleyharper@HuntonAK.com
        pguffy@HuntonAK.com

- and -

George A. Davis*[11]
George Klidonas*
Adam S. Ravin*
Yelizaveta ("Liza") Burton*
Eric F. Leon*
Kuan Huang*
Ryan Jones*
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:  george.davis@lw.com
        george.klidonas@lw.com
        adam.ravin@lw.com
        liza.burton@lw.com
        eric.leon@lw.com
        kuan.huang@lw.com
        ryan.jones@lw.com


*Proposed Counsel for the Debtors and Debtors in Possession*

---

[11] *Pro hac vice* forthcoming.

**<u>Certificate of Service</u>**

I certify that on February 15, 2024, a true and correct copy of the foregoing document

was served by the Electronic Case Filing System for the United States Bankruptcy Court for the

Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. Davidson II*
Timothy A. ("Tad") Davidson II

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ROBERTSHAW US HOLDING CORP., *et al.*, | : Case No. 24-90052 (CML) |
| | : |
| Debtors.[1] | : (Joint Administration Requested) |
| | : |
| ROBERTSHAW US HOLDING CORP., *et al.*, | : |
| | : |
| Plaintiffs, | : Adversary Proc. No. 24 - _____ (___) |
| | : |
| v. | : |
| | : |
| INVESCO SENIOR SECURED | : |
| MANAGEMENT INC., *et al.*, | : |
| | : |
| Defendants. | : |
| | : |

**ORDER GRANTING <u>EMERGENCY</u> MOTION OF THE DEBTORS (I) DECLARING THAT AUTOMATIC STAY APPLIES TO CLAIMS ASSERTED AGAINST NON-DEBTOR PARTIES IN INVESCO ACTION OR (II) EXTENDING AUTOMATIC STAY AND PRELIMINARILY ENJOINING CLAIMS AGAINST <u>NON-DEBTOR PARTIES IN INVESCO ACTION</u>**

Upon the emergency motion (the "<u>Motion</u>")[2] of Debtor Robertshaw US Holding Corp.

("<u>Robertshaw</u>," and collectively with the debtors, the "<u>Debtors</u>") for entry of an order (this

"<u>Order</u>") (a) declaring that the automatic stay applies to claims asserted against Non-Debtor Parties

---

[1]  The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are as follows:  Range Parent, Inc. (7956); Robertshaw US Holding Corp. (1898); Robertshaw Controls Company (9531); Burner Systems International, Inc. (8603); Robertshaw Mexican Holdings LLC (9531); Controles Temex Holdings LLC (9531); Universal Tubular Systems, LLC (8603); and Robertshaw Europe Holdings LLC (8843). The primary mailing address used for each of the foregoing debtors is 1222 Hamilton Parkway, Itasca, Illinois 60143.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

in the Invesco Action or, alternatively, (b) extending the Automatic Stay and preliminarily enjoining the claims against the Non-Debtor Parties in the Invesco Action; and the Court having jurisdiction to decide the Motion and to enter this Order pursuant to 28 U.S.C. § 1334; and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and the Court having determined that there is good and sufficient cause for the relief; and it appearing that entry of this Order on an emergency basis is in the best interests of the Debtors' estates and that relief is justified to avoid immediate and irreparable harm to the Debtors' estates; it is hereby **ORDERED** that:

1.     Pursuant to section 362(a)(3) of the Bankruptcy Code, the automatic stay applies to the claims asserted against the Non-Debtor Parties in the Invesco Action, or, alternatively, the automatic stay is hereby extended to the claims asserted against the Non-Debtor Parties in the Invesco Action.

2.     Pursuant to section 105(a) of the Bankruptcy Code, the parties to the Invesco Action are hereby enjoined from continuing the Invesco Action against the Non-Debtor Parties.

3.     Absent further order of this Court (such period prior to a further order of the Court regarding the following, the "Stay Period"), Invesco shall not: (i) continue the Invesco Action (including by prosecuting or defending the Invesco Action through any new filings before the court presiding over that action, except as authorized by this Court); (ii) continue or commence including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Debtors or the Non-Debtor Parties that asserts allegations or causes of action relating to those asserted in the Invesco Action, unless that action is proceeding before this Court; (iii) take

any action to obtain possession of property of the Debtors' estates or property from the Debtors' estates or to exercise control of the Debtors' estates, including, but not limited to, filing a motion to sever in the Invesco Action as to Robertshaw or the Non-Debtor Parties.

4.      The form of notice of entry of the Order attached hereto as Appendix I (the "Stay Extension Notice") is hereby approved.   The Debtors are authorized, but not directed, to file a Stay Extension Notice substantially in the form of the Stay Extension Notice on the docket of the Invesco Action.

5.      During the Stay Period, all deadlines in the Invesco Action, under any law, rule, regulation, or legal process, including any deadline for any party to (i) seek to transfer the Invesco Action to any court, (ii) seek to remove the Invesco Action to federal court, or (iii) respond to any motion or pleading in the Invesco Action, are suspended and tolled for the duration of the Stay Period.   Nothing herein shall prevent any party from requesting the court presiding over the Invesco Action to reschedule any deadline applicable to such action following the expiration of the Stay Period.   The failure of any party to seek, during the Stay Period, any relief subject to a deadline that has been suspended or tolled pursuant to this Order shall not constitute delay, laches, waiver, estoppel, or any similar defense.

6.      This Order shall not affect the substantive rights of any party, nor create any rights, defenses, or arguments not otherwise available under applicable law.    Specifically, this Order shall not affect the exceptions contained in sections 362(b), 365(b)(4), and 365(e)(2) of the Bankruptcy Code, the right of any party in interest to seek relief from the automatic stay in accordance with section 362(d) of the Bankruptcy Code, or, with respect to an unexpired lease or executory contract, any party's rights under section 365 of the Bankruptcy Code.

7.      Nothing contained in the Motion or this Order or any payment made pursuant to

the authority granted by this Order is intended to be or shall be deemed as (a) an implication or admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (c) a waiver of the Debtors' or any party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (d) a waiver of the obligation of any party in interest to file a proof of claim, (e) an agreement or obligation to pay any claims, (f) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (g) an admission as to the validity of any liens satisfied pursuant to this Motion, or (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.

8.      Notwithstanding any provision of the Bankruptcy Rules or Local Rules, the terms of this Order shall be immediately effective and enforceable upon its entry.

9.      The Debtors and their agents are authorized to take all steps necessary or appropriate to carry out this Order.

10.      The Court retains jurisdiction over all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Signed:          _____, 2024

_____

UNITED STATES BANKRUPTCY JUDGE

4

**<u>Appendix I</u>**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

_____

|  |  |
|---|---|
| INVESCO SENIOR SECURED MANAGEMENT, INC., | : Index No. 656370/2023 |
| Plaintiff, | : |
| v. | : |
| | : |
| ROBERTSHAW US HOLDING CORP., ONE ROCK CAPITAL PARTNERS LLC, BAIN CAPITAL LP, EATON VANCE MANAGEMENT, CANYON PARTNERS, LLC, and JOHN DOE 1, | : |
| Defendants. | : |

_____

**NOTICE OF ENTRY OF AN ORDER BY THE BANKRUPTCY COURT (I) DECLARING THAT AUTOMATIC STAY APPLIES TO CLAIMS ASSERTED AGAINST NON-DEBTOR PARTIES IN INVESCO ACTION OR (II) EXTENDING AUTOMATIC STAY AND PRELIMINARILY ENJOINING CLAIMS AGAINST NON-DEBTOR PARTIES IN INVESCO ACTION**

**PLEASE TAKE NOTICE** that the attached true and correct copy of the *Order (A) Declaring That Automatic Stay Applies to Claims Asserted Against Non-Debtor Parties in Invesco Action or (B) Extending Automatic Stay and Preliminarily Enjoining Claims Against Non-Debtor Parties in Invesco Action*, issued by the United States Bankruptcy Court for the Southern District of Texas, dated _____, 2024 provides that this action is temporarily stayed against Robertshaw US Holding Corp., One Rock Capital Partners LLC, Bain Capital LP, Eaton Vance Management, and Canyon Partners, LLC, through _____, 2024.

1