United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 20, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 24-90052** |
| **ROBERTSHAW US** | § | |
| **HOLDING CORP.**, *et al.*, | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **ROBERTSHAW US** | § | |
| **HOLDING CORP.**, *et al.*, | § | |
| | § | |
| | § | |
| v. | § | **ADVERSARY NO. 24-03024** |
| | § | |
| **INVESCO SENIOR SECURED** | § | |
| **MANAGEMENT INC.**, *et al.*, | § | |
| | § | |
| | § | |

## <u>MEMORANDUM DECISION AND ORDER</u>

This case is about a dispute involving liability management transactions between the Debtor, its equity sponsor, and some of its secured creditors. It is also about the desire of some lenders to obtain majority status under a credit agreement and then aggressively exercise related rights. Some lenders believe majority status gives them unfettered power to control when a debtor starts a bankruptcy case and what will happen during that case. This Court does not know whether this case is in or out of step with the norm. Parties engage in liability management transactions to try and unlock value in credit agreements. Lenders are sometimes plaintiffs in one case and defendants in another. This decision is limited to the unique facts of this case.

In late 2022, Robertshaw experienced financial difficulty, so it engaged in liability management transactions with Invesco Senior Secured Management, Inc. and certain related funds ("**Invesco**") and the "**Lender Plaintiffs**" in this case: Bain Capital Credit, LP on behalf of certain of its managed funds ("**Bain Capital**"), Canyon Capital Advisors LLC on behalf of certain of its managed funds ("**Canyon Capital**"), and Eaton Vance Management on behalf of certain of its managed funds ("**Eaton Vance**").

Robertshaw faced another liquidity challenge later that year. What followed is a series of events ending in a bitter dispute between lenders.

In the fall of 2023, Invesco became the "Required Lender" under a superpriority credit agreement and aggressively exercised its rights. It had Robertshaw enter into four amendments to the agreement without informing the other lenders. Even the administrative agent was directed to stay silent. Invesco waived Robertshaw payment defaults and extended runways in exchange for additional liquidity and more benefits. The last amendment included milestones: Robertshaw had to file bankruptcy by January 2, 2024, agree on who would be the stalking horse in a chapter 11 case, and appoint an "independent director"—who had sole authority to work on Invesco's milestones.

But the Lender Plaintiffs found out by chance about the amendments and quickly organized. Lawyers and advisors for Robertshaw and the Lender Plaintiffs formulated their own liability management transactions late in December 2023 ("**December Transactions**"). One Rock Capital Partners, LLC on behalf of certain of its managed funds ("**One Rock**"), the equity sponsor, participated in the December Transactions. The December Transactions paid Invesco over $90 million and had the effect of shifting Required Lender status from Invesco to the Lender Plaintiffs.

 Invesco sued the Lender Plaintiffs and One Rock in New York State Court in December 2023. It believes that the December Transactions are a sham and that Invesco remains the Required Lender and the primary secured creditor in control. Robertshaw started these chapter 11 cases in February 2024. On the same day, Robertshaw, One Rock, and the Lender Plaintiffs started this Adversary against Invesco.[1]

This Court held a six-day trial. For the reasons stated below, the Court finds that Robertshaw breached the credit agreement. The Lender Plaintiffs are entitled to a declaration that they did not breach the credit agreement and are the Required Lenders. One Rock is entitled to a declaration that it did not tortiously interfere with the credit agreement under New York law. Finally, Robertshaw, the Lender Plaintiffs, and One Rock are entitled to a declaration that they did not breach the implied covenant of good faith and fair dealing under New York law.

New York law gives Invesco the right to assert money damages against Robertshaw for the prepetition breach of contract. Rescission of an amendment entered during the December Transactions is not required under New York law or warranted on this record. And this Court declines to exercise any equitable remedies.

---

[1] A complete list of the Invesco defendants is found in the Complaint at ECF No. 1.

## BACKGROUND[2]

In 2018, an affiliate of One Rock acquired Robertshaw from its prior sponsor.[3] The purchase was financed with $510 million in first-lien term loans under a First-Lien Credit Agreement, $110 million in second-lien term loans under a Second-Lien Credit Agreement (together, the "**Original Credit Agreements**"), and about $260 million of equity.[4] To finance operations, Robertshaw entered a separate asset-based revolving facility maturing in December 2023 ("**ABL Facility**").[5]

### I. The May 2023 Uptier Transaction

In May 2023, Robertshaw negotiated a liability management transaction with the Lender Plaintiffs and Invesco under the Original Credit Agreements.[6] Invesco and the Lender Plaintiffs formed an ad hoc group to reach Required Lender status. The lenders proposed a transaction through which the parties would amend the Original Credit Agreements to (i) execute a new Super-Priority Credit Agreement ("**SPCA**"), (ii) provide $95 million of new First-Out New Money Term Loans, and (iii) allow participating lenders to exchange their existing first- and second-lien loans under the Original Credit Agreements for Second-Out and Third-Out Term Loans under the SPCA ("**May Transactions**").[7] This type of liability management transaction is often called an uptier. It was realized through a series of transactions in a short time span, the steps of which were laid out in advance.[8] The SPCA is governed by New York law.[9]

The SPCA adopted much of the same (or similar) language as the Original Credit Agreements, while making some changes thought prudent by the participating lenders at the time to try to protect their position.[10] This included adding blockers to protect against some future lender-on-lender type actions, but not all.[11] Matthew Brooks from Invesco testified that they "*limited* the ability to do another uptier" but outright "*eliminated* the ability to do any sort of dropdown transactions."[12] The SPCA did not materially change the definition of "Required Lender." Required Lender status, as the parties understood it, was designed to be

---

2 Trial transcripts are referenced throughout this decision as Tr.2 (ECF No. 325), Tr.3 (ECF No. 340), Tr.4 (ECF No. 336), Tr.5 (ECF No. 339), and Tr.6 (ECF No. 346). Some of the conclusions listed here are factual determinations, and others are legal conclusions. Factual and legal conclusions shall be treated as such, regardless of how they are labeled.

3 Tr.3 10:2–11.

4 Tr.3 10:2–11.

5 ABL Credit Agreement, Joint Exhibit 11, ECF No. 250-11.

6 Tr.4 65:4–22, 407:2–14.

7 Super-Priority Credit Agreement at Recitals, Joint Exhibit 1, ECF No. 250-1.

8 Tr.4 306:3–307:18.

9 Super-Priority Credit Agreement, § 9.10 Joint Exhibit 1, ECF No. 250-1.

10 Tr.4 256:13–258:21, 409:22–410:15.

11 Tr.4 409:22–410:15.

12 Tr.4 409:22–410:15.

fungible—the status may fluctuate from time to time as debt is bought or traded or ad hoc groups form and dissemble.[13] The dispositive authority on which party or group holds enough debt to be Required Lender is a register maintained by an Administrative Agent.[14]

The SPCA defines "Required Lender" to mean "[l]enders having Loans representing more than 50.0% of the sum of the total First-Out New Money Term Loans and Second-Out Term Loans at such time."[15] Section 9.02 of the SPCA allows Required Lenders to amend the SPCA, subject to enumerated exceptions (commonly referred to as "sacred rights").[16] Required Lender status gives lenders the right to, among other things, (i) agree with Robertshaw, as "Borrower," to incur additional "Indebtedness," including, but not limited to, the issuance of more term loans under the SPCA, (ii) consent to or waive any breaches, defaults, or "Events of Default," and (iii) direct the Administrative Agent to pursue remedies in the event of a breach, default, or Event of Default.[17]

Around July 2023, Invesco acquired more than 50% of the total First-Out and Second-Out Term Loans and obtained Required Lender status.[18] The Lender Plaintiffs did not know about this change.[19] Invesco met the Required Lender criteria because it owned a majority of the First-Out Term Loans but not the Second-Out Loans.[20] So the status was arguably fragile. Another lender (or group of lenders) could buy up more Second-Out Term Loans and Robertshaw could pay down some of the First-Out Term Loans. In that case, Invesco would cease to be a Required Lender.

## II.   Invesco-led Amendment Nos. 1-4

Robertshaw faced another liquidity crunch in the fall of 2023, despite its efforts to implement a turnaround plan supported by its advisors and One Rock.[21] A key component of this plan involved improving its customer relationships and contracts.[22] To address its liquidity issues and continue forward, it was close to entering into a certain "**Brigade Deal**," which would have refinanced the ABL

---

[13] Tr.4 256:13–260:15.
[14] Super-Priority Credit Agreement, § 9.05(b)(iv), Joint Exhibit 1, ECF No. 250-1; Tr.4 25:22–25.
[15] Super-Priority Credit Agreement, § 1.01 "Required Lender", Joint Exhibit 1, ECF No. 250-1.
[16] Super-Priority Credit Agreement, § 9.02(b)(A), Joint Exhibit 1, ECF No. 250-1.
[17] Super-Priority Credit Agreement, § 9.02, Joint Exhibit 1, ECF No. 250-1.
[18] Tr.4 321:6–10.
[19] Tr.4 167:5–23, 322:1–23.
[20] Tr.4 15:19–16:3, 322:1–23; Plaintiff Exhibit 78 at 2786, ECF No. 243-29.
[21] Tr.3 32:22–34:23.
[22] Tr.3 32:22–34:23.

Facility set to mature in December 2023 and provided a cash infusion to Robertshaw to make interest payments due under the SPCA.[23]

Invesco found it troubling that, though it was the Required Lender, Robertshaw sought financing from an outside source Invesco believed to be a historically "difficult counterparty."[24] Invesco reached out through joint counsel to the ad hoc group that participated in the May Transactions to inform Robertshaw that it would not support the Brigade Deal.[25] Invesco also believed the ad hoc group of lenders disbanded once the SPCA was effective.[26] So it did not inform the other lenders that it had retained separate counsel to start working on amendments to the SPCA because Robertshaw had missed an interest payment, and the grace period was almost up.[27]

Invesco and Robertshaw entered into Amendment No. 1 on October 5, 2023.[28] It extended Robertshaw's grace period to make the missed interest payment (originally due at the end of September) to October 13.[29] Without this amendment, failure to make the payment by October 6, 2023 would have resulted in an Event of Default.[30]

At the same time, the parties discussed a proposal for Robertshaw to enter into a new ABL facility. Invesco offered Robertshaw a bridge loan of $17 million in the form of additional First-Out Term Loans in exchange for Robertshaw's agreement to negotiate two other financing transactions with Invesco, including (i) a new $40 million "delayed draw term loan facility" conditioned upon Robertshaw's agreement to "repurchase" (i.e., uptier)[31] "100% of the Invesco owned Third-Out Term Loans at par" through "open market purchases" and (ii) a new $73.4 million ABL facility under which Invesco would exchange its Third-Out Term Loans for "New ABL Loans."[32] The Lender Plaintiffs were not informed about this Amendment, the missed interest payment which necessitated the Amendment, or the financing proposal.[33]

---

[23] Tr.6 10:1–11:25, 12:6–19.

[24] Tr.4 54:8–55:21, 335:7–336:13.

[25] Tr.4 336:22–347:5.

[26] Tr.4 68:6–69:22, 320:3–16.

[27] Tr.4 74:22–75:4, 77:1–17, 164:24–165:7, 168:20–169:8.

[28] Amendment No. 1 To Super-Priority Credit Agreement at Preamble, Plaintiff Exhibit 1, ECF No. 242-1.

[29] Amendment No. 1 To Super-Priority Credit Agreement, §3, Plaintiff Exhibit 1, ECF No. 242-1.

[30] Amendment No. 1 To Super-Priority Credit Agreement at Preamble, Plaintiff Exhibit 1, ECF No. 242-1.

[31] Plaintiff Exhibit 323 at 3, ECF No. 248-35; Tr.4 283:9–284:21.

[32] Plaintiff Exhibit 61, ECF No. 243-11.

[33] Plaintiff Exhibit 64, ECF No. 243-14; Plaintiff Exhibit 62, ECF No. 243-12; Tr.4 348:16–351:21; Tr.4 359:3–361:23.

Invesco and Robertshaw failed to negotiate the terms of Invesco's financing proposal. On October 13, 2023, Invesco and Robertshaw executed Amendment No. 2.[34] Invesco agreed to provide Robertshaw the $17 million bridge loan in the form of new incremental First-Out Term Loans to make the missed interest payment. Mr. Brooks testified that Invesco understood the Required Lenders could amend Section 6.01 of the SPCA to allow for additional "Indebtedness"—which is permitted in Amendment No. 2.[35] To the extent, however, this new "Indebtedness" could breach the terms of the SPCA, Invesco waived all potential defaults.[36] Invesco also committed to provide an additional $40 million term loan if certain conditions were met, but it set a November 8 deadline for Robertshaw to refinance the ABL Facility. It also included the potential for a new liability management transaction for Invesco's Third-Out Loans. The Lender Plaintiffs were not informed about this Amendment.

Robertshaw and Invesco failed to reach agreement on the terms of a new ABL facility, and the December 2023 existing ABL Facility maturity loomed. So the parties executed Amendment No. 3, which extended the November 8 deadline to refinance the ABL Facility to November 10.[37] The Lender Plaintiffs were not informed about this Amendment.

Invesco and Robertshaw then signed Amendment No. 4 in November 2023. In exchange primarily for an extension of the time to declare an Event of Default under the SPCA until December 13, Robertshaw would start a chapter 11 bankruptcy case by no later than January 2, 2024 and would:

- negotiate, in good faith, a DIP facility, an RSA, and a stalking horse purchase agreement with Invesco;[38]

- confirm that the board of its parent had directed their professionals to begin the above negotiations;[39] and

- deliver to Invesco a wind-down budget following the close of the stalking-horse sale, a list of critical vendors to be paid by the DIP along with justifications for those payments, and a summary of Robertshaw's executory

---

[34] Tr.4 362:5–363:8.

[35] Tr.4 268:5–22.

[36] Amendment No. 2 To Super-Priority Credit Agreement, §7, Plaintiff Exhibit 2, ECF No. 242-2.

[37] Amendment No. 3 To Super-Priority Credit Agreement, Plaintiff Exhibit 2, ECF No. 242-3.

[38] Amendment No. 4 To Super-Priority Credit Agreement, §7(e), Plaintiff Exhibit 4, ECF No. 242-4.

[39] Amendment No. 4 To Super-Priority Credit Agreement, §7(f)(i), Plaintiff Exhibit 4, ECF No. 242-4.

contracts along with recommendations regarding their treatment.[40]

Amendment No. 4 also required Robertshaw to appoint an "Independent Director" to the Board of Directors of Robertshaw's parent company. It gave the "Independent Director" sole authority to negotiate the terms of the bankruptcy milestones laid out in the Amendment.[41] Invesco selected Neal Goldman.[42] The Lender Plaintiffs were not informed about this Amendment.

Invesco was aware of Robertshaw's aversion to filing on January 2, which would have interfered with its existing turnaround plan—particularly the customer relations component.[43] There were discussions of a non-bankruptcy path.[44] Invesco ultimately declined to a discuss out-of-court alternatives until Robertshaw signed Amendment No. 4.[45] But, taking his fiduciary duty as independent director seriously, Mr. Goldman instructed Robertshaw's advisors to look for alternative solutions.[46]

Invesco directed the Administrative Agent in writing not to post any of these amendments.[47] Based on conversations with Mr. Brooks, advisors for Robertshaw believed posting the amendments would jeopardize negotiations around an out-of-court deal with Invesco.[48] Around November 15, the Lender Plaintiffs learned about the amendments when a third party casually mentioned them to an employee at Bain Capital.[49] Counsel for the Lender Plaintiffs then reached out to the Administrative Agent on November 16 demanding that the amendments be posted. Amendment Nos. 1–4 were posted later that day.[50]

---

[40] Amendment No. 4 To Super-Priority Credit Agreement, §7(f)(v), Plaintiff Exhibit 4, ECF No. 242-4.

[41] Amendment No. 4 To Super-Priority Credit Agreement, §7(f)(iv)(2), Plaintiff Exhibit 4, ECF No. 242-4.

[42] Tr.2 10:11–12:12.

[43] Tr.2 20:20–21:19; Tr.3 37:1–41:14.

[44] Tr.3 37:1–41:14; Joint Exhibit 25, ECF No. 250-29; Plaintiff Exhibit 91, ECF No. 243-43.

[45] Plaintiff Exhibit 91, ECF No. 243-43.

[46] Tr.2 11:3–12, 14:2–15:17.

[47] Tr.5 246:23–247:7; Deposition Testimony of Administrative Agent (Jennifer Anderson), ECF No. 312-1 at 4.

[48] Tr.6 63:6–24.

[49] Tr.4 172:2–173:3, 378:20–379:25.

[50] Plaintiff Exhibit 94, ECF No. 243-46.

### III.   The December Transactions and Amendment No. 5

After discovering the Invesco-led Amendments and looming bankruptcy, the Lender Plaintiffs started working with Robertshaw and One Rock on alternative financing solutions and ultimately submitted a proposal.[51] The board's advisors presented an analysis of the relative benefits of the December Transactions compared to filing for bankruptcy on January 2. The record is undisputed that the company needed additional liquidity. Based on that analysis, the board, including Mr. Goldman, voted to approve the transactions.[52] The December Transactions consisted of six sequential steps:

> *First*, Range Parent's ("**Holdings**")[53] parent, Range Investor LLC, formed RS Funding Holdings, LLC ("**RS Funding**").[54] Holdings is Robertshaw's parent. Range Investor holds 100% of the voting interest in RS Funding.[55] Robertshaw holds 100% of the economic interest in RS Funding.[56]
>
> *Second*, on December 11, the Lender Plaintiffs and One Rock loaned $228.3 million to RS Funding ("**RS Funding Credit Agreement**").[57]
>
> *Third*, exercising its power as 100% voting interest owner, Holdings instructed RS Funding to distribute the proceeds of the $228.3 million loan to Robertshaw.[58]
>
> *Fourth*, Robertshaw used the funds from RS Funding to (i) pay off the outstanding $30 million ABL Facility in full, (ii) voluntarily prepay $117.6 million of the outstanding First-Out Term Loans, and (iii) pay an additional $30.7 million in required make-whole payments to the holders of First-Out Term Loans.[59] The prepayment was made to the Administrative Agent, who, in turn, disbursed the funds to the appropriate First-Out Term Loan Lenders and recorded the prepayment in the register.[60] After the

---

[51] Plaintiff Exhibit 148, ECF No. 244-51.
[52] Tr.2 15:25–20:14, 166:8–23; Plaintiff Exhibit 247, ECF No. 246-47.
[53] Super-Priority Credit Agreement at Preamble, Joint Exhibit 1, ECF No. 250-1.
[54] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[55] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[56] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[57] Plaintiff Exhibit 148 at 5, ECF No. 244-51.
[58] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[59] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[60] Tr.4 315:17–317:1.

prepayment, the register maintained by the Administrative Agent reflected that the Invesco no longer owned more than 50% of the combined First- and Second-Out Term Loans needed to maintain Required Lender status.[61] The Lender Plaintiffs now held Required Lender status.[62]

*Fifth*, the Lender Plaintiffs, as Required Lenders, executed Amendment No. 5 to the SPCA.[63] This Amendment authorized Robertshaw to issue $228 million in incremental debt.[64]

*Sixth*, once the conditions precedent to Amendment No. 5 were either met or waived, Robertshaw issued $218 million in new First-Out and Second-Out Loans.[65] Robertshaw returned an equivalent amount to RS Funding, which repaid the loan under the RS Funding Credit Agreement.[66]

Invesco received over $90 million. It tried to reject the prepayment (and now holds the funds in protest in escrow).[67] But the Administrative Agent, tasked with disbursing funds in accordance with the register, disbursed the funds to Invesco.[68] Invesco sent notice of an Event of Default under the SPCA to Robertshaw based on this allegation on December 11, 2023.[69]

Invesco challenges the prepayment as violating the SPCA because not all the proceeds were used to pay off existing indebtedness, and they were not distributed pro rata among all tranches of debt. Instead, a portion of the RS Funding cash distribution was added to Robertshaw's balance sheet, and some was used to pay off the ABL Facility. Only the First-Out Term Loans received a prepayment. This allegedly violated Sections 2.11(b)(iii) and (vi) of the SPCA. Invesco believes, had the funds been distributed pro rata across all tranches, it would not have lost Required Lender status.

---

[61] Plaintiff Exhibit 16, ECF No. 242-20.
[62] Plaintiff Exhibit 16, ECF No. 242-20.
[63] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[64] Amendment No. 5 To Super-Priority Credit Agreement, Plaintiff Exhibit 5, ECF No. 242-5.
[65] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[66] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[67] Tr.4 315:17–317:1; Tr.5 15:16–21.
[68] Tr.4 315:17–317:1.
[69] Plaintiff Exhibit 348, ECF No. 248-67.

Invesco also argues the Administrative Agent resigned in protest of the December Transactions.[70] And that Amendment No. 5 contained conditions precedent to its effectiveness.[71] These included several items related to the Administrative Agent concerning receipt of compliance certifications, opinions of counsel, and a funds flow memorandum.[72] Invesco claims the Administrative Agent did not receive the transaction documents until December 14, 2023, several days after they were signed.[73] So, according to Invesco, Agent consent was required but never obtained.

## IV.   Invesco Files Suit In New York State Court

Less than two weeks after the execution of Amendment No. 5, Invesco filed a complaint in the Supreme Court of the State of New York, asserting claims for (i) breach of the SPCA against Robertshaw and the Lender Plaintiffs, (ii) breach of the covenant of good faith and fair dealing against Robertshaw and the Lender Plaintiffs, (iii) tortious interference with contract against One Rock, and (iv) intentional and constructive fraudulent transfer against the Lender Plaintiffs and One Rock. Invesco also sought a preliminary injunction "(i) enjoining any transactions or arrangements purportedly requiring only the consent or direction of the Lender Plaintiffs and/or One Rock, including but not limited to those in Amendment No. 5, (ii) enjoining the execution of Amendment No. 5 by the Administrative Agent, and (iii) reinstating of Amendment No. 4."[74]

The New York State Court did not rule on Invesco's motion before the petition date in these bankruptcy cases.

## V.    Robertshaw Starts Bankruptcy Cases and This Adversary

The Robertshaw debtors started these bankruptcy cases on February 15, 2024. Robertshaw, One Rock, and the Lender Plaintiffs started this Adversary on the same day. Invesco filed two counterclaims seeking declaratory judgment against Robertshaw that it breached the SPCA, and Invesco is still the Required Lender.[75]

In April 2024, this Court entered an order staying the New York litigation until July 15, 2024.

---

[70] Invesco's Answer, Affirmative Defenses, and Counterclaims at 16, ECF No. 45.

[71] Amendment No. 5 To Super-Priority Credit Agreement, §7(e), (g), Plaintiff Exhibit 5, ECF No. 242-5.

[72] Amendment No. 5 To Super-Priority Credit Agreement, §7(e), (g), Plaintiff Exhibit 5, ECF No. 242-5.

[73] Invesco's Answer, Affirmative Defenses, and Counterclaims at 32, ECF No. 45.

[74] Plaintiff Exhibit 170, ECF No. 245-20.

[75] Invesco's Answer, Affirmative Defenses, and Counterclaims at 39, ECF No. 45.

## JURISDICTION AND VENUE

The Court has jurisdiction under 28 U.S.C. § 1334(b). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (K), and (O). The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011).

Resolving the matters before the Court are integral to the administration of these cases and the determination and adjustment of the debtor/creditor relationship. These chapter 11 cases are at a standstill and cannot proceed until this Court declares who the current Required Lenders under the SPCA are or, relatedly, if One Rock tortiously interfered with the SPCA. Required Lender status determines who the fulcrum secured creditors are and how they will credit bid at a Court approved auction for the sale of Robertshaw's assets. Making this determination also involves matters inextricable from Robertshaw's chapter 11 plan.

To the extent that the Court does not have the requisite constitutional authority to enter a final judgment on any issue in this Adversary, then this Memorandum Decision will constitute the Court's report and recommendation to the District Court.

## ANALYSIS

Federal courts may declare the rights and other legal relations of a party seeking declaration under 28 U.S.C. § 2201(a). New York law also permits courts to "render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed." N.Y. C.P.L.R. § 3001 (McKinney 2009).

Robertshaw and the Lender Plaintiffs seek declaratory judgment that the December 2023 Transactions did not breach the SPCA and that Amendment No. 5 is valid and enforceable. They also seek a declaration that they did not breach a duty of good faith and fair dealing. One Rock also seeks a declaration that it did not tortiously interfere with the SPCA. Invesco disagrees with the relief sought by Robertshaw, the Lender Plaintiffs, and One Rock. So there are controversies here.

## I. A Subsidiary Incurred Indebtedness in Violation of Section 6.01 of the SPCA.

Under New York law, there are four elements for a breach of contract claim: (i) the existence of a contract, (ii) plaintiff's performance under the contract, (iii) the defendant's breach of contractual obligations, and (iv) damages caused by the defendant's breach. *See 34–06 73, LLC v. Seneca Ins.*, 39 N.Y.3d 44, 52 (N.Y. 2022). Only the last two elements are disputed.

In New York, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent" and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records,* 98 N.Y.2d 562, 569 (N.Y. 2002) (internal quotation marks and citation omitted). Any "unambiguous provision" of a contract is given its "plain and ordinary meaning." *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 749 (S.D.N.Y. 2016), aff'd, 712 F. App'x 57 (2d Cir. 2017) (quoting *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (N.Y. 2007)) (internal quotations omitted). Courts interpret contracts to give "full meaning and effect to the material provisions" and avoid interpretations that render certain provisions meaningless. *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 185 N.Y.S.3d 73, 84 (App. Div. 2023) (quoting *Excess Ins. Co. v. Factory Mut. Ins.*, 3 N.Y.3d 577, 582 (N.Y. 2004)).

Section 6.01 of the SPCA restricts the incurrence of Indebtedness: "Holdings, the Borrowers and each Subsidiary shall not, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness" subject to exceptions not relevant here.[76] "Holdings" means Robertshaw's parent, Range Parent, Inc.[77] Robertshaw is a "Borrower."[78] The parties dispute whether RS Funding is a "Subsidiary."

The SPCA defines "Subsidiary" to mean one of two things:

- "with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50.0% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person of a combination thereof; provided that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a 'qualifying share' of the former Person shall be deemed to be outstanding;" or

---

[76] Super-Priority Credit Agreement, § 6.01, Joint Exhibit 1, ECF No. 250-1.
[77] Super-Priority Credit Agreement at Preamble, Joint Exhibit 1, ECF No. 250-1.
[78] Super-Priority Credit Agreement at Preamble, Joint Exhibit 1, ECF No. 250-1.

- "any subsidiary of Holdings other than an Unrestricted Subsidiary."[79]

Robertshaw argues the capitalization of the first definition of "Subsidiary" was a scrivener's error. It alleges that in the Original Credit Agreements (before the May Transactions), the first definition of subsidiary was not capitalized, and the second definition was capitalized. So the first definition of Subsidiary should be similarly read as if it were not capitalized.

Under the Original Credit Agreements, a "Subsidiary" is defined as "any *subsidiary* of Holdings . . . " and "subsidiary" was a separately defined term focused on entities for which Holdings held voting control (the first definition). In that context, RS Funding would not be a "subsidiary" because Holdings and Robertshaw do not own voting interests in it. If it could not be a "subsidiary," it also could not be a "Subsidiary" because the definition of the latter incorporated the former.

But in the SPCA, that analysis changes because both definitions of Subsidiary are capitalized. And "subsidiary" in the definition "any *subsidiary* of Holdings" is not a defined term. An undefined term must be read according to its plain, ordinary meaning. That renders the second definition of "Subsidiary" much broader than it was in the Original Credit Agreements—no longer limited to certain types of subsidiaries. Applying the plain meaning, RS Funding is a "subsidiary of Holdings."

To establish a scrivener's error, Robertshaw must show "obvious error by clear and convincing evidence." *NCCMI, Inc. v. Bersin Props., LLC*, 208 N.Y.S.3d 27, 32 (App. Div. 2024) (citing *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 194 (App. Div. 2013)). Outside an actual claim for reformation of contract, "a court may correct a scrivener's error in 'those limited circumstances where some absurdity has been identified or the contract would be otherwise unenforceable.'" *Id.* at 32 (quoting *Matter of Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 547–48 (N.Y. 1995)); *see also PNC Cap. Recovery v. Mech. Parking Sys., Inc.*, 726 N.Y.S.2d 394, 397 (App. Div. 2001) (reforming a scrivener's error when the court found it would otherwise produce the illogical result that a company could guaranty its own indebtedness). This imposes an intentionally high bar on the party arguing there is an error. *Id.*

Robertshaw's counsel argued the capitalization was an overlooked typo never intended by the parties. But according to Invesco's witness, Mr. Brooks, the definition of subsidiary was capitalized in the first draft of the SPCA.[80] He relied on this broader definition because it provided him more protection as a lender under

---

[79] Super-Priority Credit Agreement, § 1.01 "Subsidiary", Joint Exhibit 1, ECF No. 250-1.
[80] Tr.5 24:5–8.

the SPCA.[81] Mr. Brooks "took it that the definition of subsidiary was as it was presented in the definition section."[82] Based on the record, there is not sufficient evidence of a scrivener's error.

Enforcing the SPCA on its own terms also does not lead to illogical or absurd interpretations of the text. The Court must interpret the text to give each part meaning and not render the decision to capitalize the first definition meaningless. *See AEA Middle Mkt. Debt Funding LLC*, 185 N.Y.S.3d at 84. It is not absurd or illogical to read the SPCA as expanding the second definition to include more subsidiaries of Holdings. The SPCA was negotiated between sophisticated parties. Without clear evidence to the contrary, the Court must enforce the SPCA as written. RS Funding is a "Subsidiary" that incurred "Indebtedness" in violation of Section 6.01.

## II.   The Prepayment and Section 2.11(b) of the SPCA.

The SPCA contemplates that a Subsidiary may incur Indebtedness that violates Section 6.01, and that Robertshaw may receive proceeds on account of that Indebtedness. It provides the remedy for that violation in Section 2.11.

Section 2.11 of the SPCA governs prepayments.[83] There are two relevant pathways under this section: voluntary and mandatory prepayments. Under the voluntary prepayment provision, Robertshaw has the right to "at any time and from time to time to prepay any Class of Loans in whole or in part."[84] Robertshaw and the Lender Plaintiffs believe Robertshaw made a voluntary prepayment, so a partial payment was allowed. The Court disagrees because RS Funding is a "Subsidiary." And because Robertshaw received the proceeds of Indebtedness not allowed under Section 6.01, the mandatory prepayment provision applies.

Section 2.11(b)(iii) says:

> In the event that . . . any Subsidiaries . . . receive Net Proceeds from the issuance or incurrence of Indebtedness of . . . any Subsidiaries (other than with respect to Indebtedness permitted under Section 6.01), the Borrowers shall, substantially simultaneously with . . . the receipt of such Net Proceeds by such Borrower or such Subsidiary, apply an amount equal to 100% of such Net Proceeds to prepay outstanding Term Loans.[85]

---

[81] Tr.5 24:10–12.

[82] Tr.5 24:13–15.

[83] Super-Priority Credit Agreement, § 2.11, Joint Exhibit 1, ECF No. 250-1.

[84] Super-Priority Credit Agreement, § 2.11(a)(i), Joint Exhibit 1, ECF No. 250-1.

[85] Super-Priority Credit Agreement, § 2.11(b)(iii), Joint Exhibit 1, ECF No. 250-1.

Section 2.11(b)(vi) further provides that, as to mandatory prepayments:

> [a]ll accepted prepayments under this Section 2.11(b) shall
> be applied against the remaining scheduled installments of
> principal due in respect of the Initial Term Loans to the
> remaining scheduled amortization payments in respect of
> the Term Loans in direct order of maturity, and each such
> prepayment shall be paid to the Lenders in accordance
> with their respective Applicable Percentage.[86]

The language "in accordance with their respective Applicable Percentage" means that within a class, if the Net Proceeds[87] are insufficient for the prepayment to pay out the class, the prepayment is distributed according to the Lenders' relative holdings within that class.[88] Invesco argues that the prepayment constituted a breach because the prepayment had to be pro rata across *all* tranches based on its reading of Section 2.11(b)(vi).[89] Such a reading is inconsistent with the plain language of this Section and eviscerates the function of holding First-Out Term Loan debt. The plain language of the mandatory prepayment provisions in Section 2.11(b) does not justify upsetting that construction, and the language must be read in the context of the SPCA.

Because Robertshaw failed to pay 100% of the Net Proceeds as a mandatory prepayment, it breached Section 2.11(b)(iii) of the SPCA only by not paying all the proceeds.

## III.   Invesco is Not Entitled to a Restored Required Lender Status.

Invesco wants to be restored to Required Lender status because of Robertshaw's breach. The SPCA does not mandate that result, and the Court declines to diverge from the precise terms of the agreement. The mandatory payment provisions are how the SPCA specifically deals with unauthorized incurrence of Indebtedness. Had the prepayment been made in full, the result would still be that Invesco was no longer Required Lender. There is no need to look for remedies outside the four corners of the SPCA. Under New York law and the plain terms of the SPCA, Invesco's remedy for any loss is direct (money) damages, not any of the number of equitable remedies Invesco argues for: rescinding

---

[86] Super-Priority Credit Agreement, § 2.11(b)(vi), Joint Exhibit 1, ECF No. 250-1.

[87] Net Proceeds means "with respect to any issuance or incurrence of Indebtedness, the Cash proceeds thereof, net of" things like taxes and attorneys' fees. Super-Priority Credit Agreement, § 1.01 "Net Proceeds", Joint Exhibit 1, ECF No. 250-1.

[88] Super-Priority Credit Agreement, § 1.01 "Applicable Percentage," Joint Exhibit 1, ECF No. 250-1.

[89] The Court also notes that Invesco, despite its assertion that it holds the funds in protest in escrow, does not have the right to reject prepayment made under Section 2.11(b)(iii). Super-Priority Credit Agreement, § 2.11(b)(v), Joint Exhibit 1, ECF No. 250-1.

Amendment No. 5, permitting Invesco to return the prepayment, or rescission.[90] New York courts consistently hold "the equitable remedy of rescission is not available where there is an adequate legal remedy, and [when] plaintiff does not explain why damages – a legal remedy – would be insufficient." *Empire Outlet Builders LLC v. Constr. Res. Corp. of New York*, 97 N.Y.S.3d 68, 69 (App. Div. 2019); *Romanoff v. Romanoff*, 51 N.Y.S.3d 36, 40 (App. Div. 2017) ("The remedy of rescission is unavailable [when] money damages are available and will make plaintiff whole.").[91]

At trial, Invesco introduced a novel theory of damages to argue the prepayment mandated by the SPCA is not an adequate remedy: *if* it were the Required Lender in December 2023, Robertshaw *would* have started a bankruptcy case in January 2024, Invesco *would* have been selected as a Debtor In Possession financing lender entitled to fees and senior liens, and Invesco *would* have been selected as the stalking horse bidder. All of this is based on pure speculation.

There is nothing in the record suggesting that Robertshaw's board was sure to approve a January 2 filing even if it was a milestone in Amendment No. 4. The record showed that the independent director, Mr. Goldman, and the company's advisors thought it could harm the company.[92] A lender cannot force a company to sign bankruptcy petitions. And, assuming a filing, no one can be certain what would have happened in a bankruptcy case filed on January 2. All requests for relief are subject to bankruptcy court approval after the presentation of sufficient evidence to warrant relief and consideration of applicable law. Invesco presumes, for example, that it would automatically be the stalking horse, and that no party (either the Lender Plaintiffs or a third party) would propose better terms for DIP financing. Detailed demonstratives and financial projections about what recoveries Invesco may have expected to achieve by acting as DIP Lender and credit bidding the DIP

---

[90] Because the issue of the scrivener's error and resulting mandatory prepayment is dispositive, it is not necessary to determine whether to collapse the steps of the December Transactions. Or how Invesco argues the steps in the December Transactions are a sham, but similar steps in the May Transactions (which Invesco participated in) are not a sham.

[91] The Bankruptcy Code also provides that "after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. . . ." 11 U.S.C. § 510(c). Equitable subordination is remedial in nature and is "rarely granted." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.* (*In re Cajun Elec. Power Coop., Inc.*), 119 F.3d 349, 357 (5th Cir. 1997). "As a practical matter, we generally have found equitable subordination in only three typical cases: '(1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors.'" *Id.* These facts do not warrant even consideration of an equitable remedy like subordination.

[92] Tr.2 19:24–22:20; Plaintiff Exhibit 247, ECF No. 246-47.

through up to Invesco's third-out position prove nothing.[93] It is all based on speculation and a perception of total control because of Required Lender status.

Whatever additional damage Invesco purports to have suffered because of the avoidance of the January 2 bankruptcy case would also constitute indirect or consequential damages. And Section 9.04 of the SPCA says the parties, and any related parties, waive claims against each other based on special, indirect, consequential, or punitive damages arising out of the SPCA, and any Loan or the proceeds of it.[94]

New York law also does not recognize damages for lost profits that require "the court to accept too many speculative assumptions." *Wathne Imports, Ltd. v. PRL USA, Inc.*, 953 N.Y.S.2d 7, 11 (App. Div. 2012) (citing *Ashland Mgt. v. Janien*, 82 N.Y.2d 395, 405–06 (N.Y. 1993)). "A party may only recover damages for loss of future profits if it 'demonstrate[s] with certainty that such damages have been caused by the breach . . ., the alleged loss must be capable of proof with reasonable certainty . . . not [ ] merely speculative, possible or imaginary . . . and the particular damages [must have been] fairly within the contemplation of the parties.'" *Id.* at 10 (citing *Kenford Co. v. Erie County*, 67 N.Y.2d 257, 261 (N.Y. 1986)).

## IV.   The Lender Plaintiffs are Entitled to Declaratory Judgment that They Did Not Breach the SPCA and Amendment No. 5 is Valid.

The fact that the prepayment did not fully comply does not mean the Lender Plaintiffs breached Section 2.11. This Section only obligates Robertshaw to prepay.[95] The SPCA also imposes no obligations on the Lender Plaintiffs under Sections 6.01(a), 9.02,[96] or 7(g) relevant here—which are other Sections that Invesco alleges the Lender Plaintiffs breached. The Lender Plaintiffs are entitled to a declaration that they did not breach the SPCA. Declaratory judgment here is supported by bedrock New York contract law. *See, e.g., Kranze v. Cinecolor Corp.*, 96

---

[93] Tr.5 9:1–11:17, 26:17–27:13; Joint Exhibit 24, ECF No. 250-28; Invesco Demonstratives 1-3, ECF No. 306.

[94] Super-Priority Credit Agreement, § 9.04, Joint Exhibit 1, ECF No. 250-1. "Loan" means any Term Loan under the SPCA.

[95] Super-Priority Credit Agreement at Article 6 Preamble, Joint Exhibit 1, ECF No. 250-1.

[96] Section 9.02(b)(A)(9) is the "Incora Blocker" (named for another bankruptcy case pending in this District) or "vote rigging protection" (as the parties referred to it from time to time). It prevents Borrowers and Required Lenders from amending the SPCA to "authorize additional Indebtedness *that would be issued under the Loan Documents* for the purpose of influencing voting threshold."[96] It does not prevent incurring Indebtedness from another source, which instead triggers the mandatory prepayment mechanism in Section 2.11. Amendment No. 5 did not influence the voting threshold; the prepayment did. The prepayment remedy explicitly provided under Section 2.11 does not violate the "sacred right" in Section 9.02(b)(A)(9). Moreover, as stated herein, the purpose of the December Transactions was to increase the company's liquidity and prevent what the company and its advisors viewed as a value-destroying bankruptcy filing at a time when the company was trying to implement a turnaround plan. *See, e.g.,* Tr.4 194:21–195:2, 207:8–13.

F. Supp. 728, 729 (S.D.N.Y. 1951) (Even in a multi-party contract, "each party is bound only for the performance he promised.").

There is no language in the SPCA to support Invesco's stance that because the prepayment was not properly applied under Section 2.11, the new Required Lenders were barred from entering Amendment No. 5. There is language in other sections of the SPCA declaring that certain actions taken in contravention of the terms of the contract will be "null and void," but no such provision applies to the mandatory prepayment provision or Section 6.01.[97] There is also "default blocker" language in other parts of the SPCA that prevent parties from taking certain actions after an Event of Default, which is absent in Section 2.11.[98] Nulling and voiding the December Transactions is not a remedy provided by the SPCA or under New York Law.

Invesco alternatively argues that Amendment No. 4 placed a blanket restriction on the incurrence of Indebtedness. It says, "[a]fter the Amendment No. 4 Effective Date, (i) neither the Company nor any other Loan Party shall create, issue, incur, assume or permit to exist any Indebtedness for borrowed money." The plain language of the Amendment does not restrict Subsidiaries as the SPCA does. RS Funding is not a Loan Party. It is also not a Lender Plaintiff. Thus, the Lender Plaintiffs did not breach this covenant of Amendment No. 4.

Invesco next argues that the Lender Plaintiffs failed to meet the conditions precedent (delivery of a funds flow statement, receipt of consents, etc.) in Amendment No. 5, which it argues means the Amendment was never effective. The prefatory language of Section 7 states that the "Amendment shall be effective upon the date . . . on which the following conditions shall have been satisfied (or waived by the Consenting Lenders)."[99] Section 9.02 of the SPCA provides that "no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent."[100]

The evidence shows that the Administrative Agent did consent to the transaction and recognized the Lender Plaintiffs as Required Lenders.[101] The Administrative Agent also dispelled Invesco's claim that it "resigned in protest" because it thought the amendment was somehow unlawful.[102] The Agent made the

---

[97] *See, e.g.,* Super-Priority Credit Agreement, § 9.05, Joint Exhibit 1, ECF No. 250-1.
[98] Super-Priority Credit Agreement, § 5.10, Joint Exhibit 1, ECF No. 250-1.
[99] Amendment No. 5 To Super-Priority Credit Agreement, §7, Plaintiff Exhibit 5, ECF No. 242-5.
[100] Super-Priority Credit Agreement, § 9.02, Joint Exhibit 1, ECF No. 250-1.
[101] Tr.4 61:4–62:8.
[102] Tr.4 61:4–62:8.

prepayment and changed the register to reflect the Lender Plaintiffs were the
Required Lenders.[103]

Invesco was no longer Required Lender by the time Amendment No. 5 was
entered. If any other SPCA section were potentially breached (including the
restrictions on Indebtedness Invesco added into Amendment No. 4 without
informing other lenders), Amendment No. 5 waived all such defaults, just like prior
Invesco-driven Amendment Nos. 1-4 did.

Thus, the Lender Plaintiffs are entitled to a declaration that (i) they did not
breach the SPCA, and (ii) Amendment No. 5 is valid and enforceable. Invesco will be
entitled to file a proof of claim for any alleged prepetition money damages. The
Lender Plaintiffs and One Rock remain the Required Lenders.

## V.    One Rock Did Not Tortiously Interfere with the SPCA.

One Rock, through some of its managed funds, indirectly holds a majority
equity interest in Robertshaw.[104] Kurt Beyer, a partner at One Rock, serves on
Robertshaw's board of directors.[105] One Rock did not participate in the May
Transactions.[106] It is also not a party to the SPCA. One Rock did, however,
participate in the December 2023 Transactions with the other Lender Plaintiffs.[107]
Invesco alleges One Rock tortiously interfered with the SPCA by colluding and
conspiring with the Lender Plaintiffs and participating in the December
Transactions. One Rock disagrees and seeks a declaration that it did not tortiously
interfere with the SPCA under New York law.

There are five elements in a tortious interference with contract claim under
New York law: "(1) 'the existence of a valid contract between the plaintiff and a
third party;' (2) 'the defendant's knowledge of the contract;' (3) the 'defendant's
intentional procurement of the third-party's breach of the contract without
justification;' (4) 'actual breach of the contract;' and (5) 'damages resulting
therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006)
(quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996)).
To prove intentional procurement without justification, a plaintiff must prove
(i) "that the *target* of a defendant's conduct was the third party's contractual
arrangements with the plaintiff" and (ii) "that 'the defendant's *objective* was to
procure such a breach.'" *Better HoldCo., Inc. v. Beeline Loans, Inc.*, 666 F. Supp.3d
328, 399 (S.D.N.Y. 2023) (internal citations omitted). The interference "must be
intentional, not merely negligent or incidental to some other, lawful purpose." *Id.* A

---

[103] Plaintiff Exhibit 16, ECF No. 242-20.
[104] Beyer Demonstrative I; Tr.3 12:2–15.
[105] Beyer Demonstrative I; Tr.3 12:2–15.
[106] Tr.3 28:22–25.
[107] Tr.3 64:16–18.

plaintiff must also allege that "the contract would not have been breached 'but for' the defendant's conduct." *See Burrowes v. Combs*, 808 N.Y.S.2d 50, 53 (App. Div. 2006).

In response to a tortious interference claim, a creditor or equity holder may raise an "economic interest defense—that it acted to protect its own legal or financial stake in the breaching party's business . . . ." *Abele Tractor & Eqip. Co. v. Schaeffer*, 91 N.Y.S.3d 548, 551 (App. Div. 2018) (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 867 N.E.2d 381, 384 (N.Y. 2007)). The defense is raised when "defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *White Plains*, 867 N.E.2d at 384 (collecting cases). "[I]mposition of liability in spite of a defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means on the other." *WMW Mach. Co. v. Koerber AG*, 658 N.Y.S.2d 385, 386 (App. Div. 1997) (citing *Foster v Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996)).

Based on the record, this Court has no doubt that One Rock did not tortiously interfere with the SPCA. One Rock did not intentionally procure any breach of the SPCA, and One Rock was not the but for cause of any such breach by Robertshaw or the Lender Plaintiffs—and that does not even account for the economic interest defense.

Mr. Beyer testified that One Rock's goal was to help Robertshaw finance its turnaround plan by providing it necessary liquidity and avoiding the harm caused by a January 2, 2024 bankruptcy filing.[108] One Rock did not structure the December Transactions or influence the Lender Plaintiffs or Robertshaw to do it.[109] It also did not vote on the December Transactions.[110]

Invesco's arguments that One Rock conspired or colluded with the Lender Plaintiffs fail to establish but for causation, necessary to establish tortious interference with a contract. *See, e.g.*, *Granite Partners, L.P. v. Bear, Sterns & Co.*, 17 F. Supp. 2d 275, 294 (S.D.N.Y. 1998) ("[C]ollusion involving a party to the contract indicates as a matter of law that the party involved was predisposed to breach its contractual obligations; thus, the allegedly interfering party cannot be the 'but for' cause of the breach."); *Sharma v. Skaarup Ship Mgmt. Corp.*, 699 F. Supp. 440, 447 (S.D.N.Y. 1988), aff'd, 916 F.2d 820 (2d Cir. 1990) (dismissing tortious interference with contract claim based on allegation that "by conspiring and

---

[108] Tr.3 66:20–25, 75:4–21.

[109] Tr.3 58:13–16, 69:11–13.

[110] Tr.3 72:13–19.

acting with" a party to the contract and "in no way . . . allege[d] that defendants were the motivating force behind [the party's] breach"). Robertshaw's actions were informed by its advisors and its independent director.[111] The Lender Plaintiffs also independently decided to enter into the December Transactions.[112] Lenders had their own reasons for entering into the December Transactions, including concerns from Robertshaw management that Invesco intended to uptier its Third-Out debt and their belief that it would prevent an unnecessary bankruptcy filing.[113]

Declaratory judgment is warranted for these reasons alone. But even if a prima facie showing of tortious interference could be established by Invesco, the economic interest defense would overcome any such claim. One Rock supported Robertshaw's turnaround plan and efforts to increase liquidity and believed a January 2024 filing would harm Robertshaw.[114] Mr. Beyer's testimony was supported by the facts in the record. One Rock had a right under New York law to protect its economic interest in Robertshaw by entering into the December Transactions and not allowing what it believed to be a value-destructive bankruptcy filing. That Robertshaw ended up filing bankruptcy (in part because additional liquidity Robertshaw received is tied up in litigation with Invesco) or that parties understood Robertshaw could potentially file does not change the answer. There is no meaningful evidence that One Rock acted for any reason other than to protect its economic interest, and there is no evidence of malice or fraudulent or illegal means that would overcome the defense.

Declaratory relief for One Rock is granted.

## VI. Robertshaw and the Lender Plaintiffs Did Not Breach the Duty of Good Faith and Fair Dealing.

Robertshaw and the Lender Plaintiffs seek a declaratory judgment that the December Transactions did not breach the duty of good faith and fair dealing under New York law.

New York law implies a duty of good faith and fair dealing in every contract. The duty comprises "any promises which a reasonable person in the position of the promisee would be justified in understanding were included [in the contract]." *Dalton v. Educ. Testing. Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). The implied covenant prevents parties from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Brown v. Erie Ins.*, 172 N.Y.S.3d 299, 301 (App. Div. 2022). "Absent a connection to an express or presumed contractual right or obligation, the doctrine

---

[111] Tr.3 55:25–56:8, 59:4–11, 62:6–11, 64:19–25.

[112] *See, e.g.,* Tr.4 188:4–207:13.

[113] *See, e.g.,* Tr.2 173:8–180:6, 189:8–191:4; Tr.3 72:5–12; Tr.4 188:4–207:13.

[114] Tr.3 66:20–67:3, 75:4–21.

'does not import a generalized code of good conduct into the law of contracts.'" *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 456 (S.D.N.Y. 2021) (quoting *Scottsdale Ins. v. McGrath*, 549 F. Supp. 3d 334, 353 n.6 (S.D.N.Y. 2021)). It also cannot be used to create new and independent contractual rights. *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 761 N.Y.S.2d 22, 23 (App. Div. 2003).

Declaratory relief for the Lender Plaintiffs is warranted. First, as noted above, there is nothing in the SPCA specifically imposing duties between lender parties based on payment of debts or incurring new debt. Second, Invesco, Robertshaw, and the Lender Plaintiffs established a baseline of conduct between themselves by engaging in liability management transactions. They conducted the May 2023 Transaction as a unified group and defended that uptier in a resulting dispute with non-participating lenders. The SPCA itself is full of blockers and clauses named for other liability management cases.

Invesco engaged in acts it now calls bad faith. It engaged in lender-on-lender acts through Amendment Nos. 1-4. This involved instructing the Agent not to post Amendments and planning an Invesco controlled bankruptcy filing right after New Year's Day—all without informing other lenders. Invesco also contemplated a liability management transaction of its own in Amendment No. 2. Upon discovering Invesco's actions, Robertshaw's board and the Lender Plaintiffs agreed to the December Transactions as an alternative route. Robertshaw's advisors and the Lender Plaintiffs testified that they believed the December Transactions would help the company achieve its turnaround plan, infuse $40 million in the company, and prevent what they reasonably perceived to be a financially harmful January 2024 bankruptcy filing.[115] Based on the record before the Court, no one may claim a breach of the implied duty of good faith and fair dealing.[116]

---

[115] *See, e.g.,* Tr.4 207:11–13; Tr.2 178:4–15.

[116] The facts and actions of the lenders in this case are distinguishable from other New York law cases. *See, e.g., In re LightSquared Inc.*, 511 B.R. 253, 333–34 (Bankr. S.D.N.Y. 2014) (breaching party wore multiple hats in an effort to disguise or insulate a company from responsibility and achieve an end-run around the substance of restrictions in a credit agreement); *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp.2d 625, 631 (S.D.N.Y. 2010) (cited in *LightSquared* and based on similar reasoning); *Medacist Sols Grp., LLV v. CareFusion Sols., LLC*, No. 19-CV-1309, 2021 WL 293568, *12 (S.D.N.Y. Jan. 28, 2021) (breaching party purposefully delayed sales so it could terminate a contract and then sell its own product).

## <u>ORDER</u>

For the reasons stated above, the Court declares that:

1.  Bain Capital, Eaton Vance, Canyon Capital, and One Rock are the Required Lenders under the SPCA;

2.  Bain Capital, Eaton Vance, and Canyon Capital did not breach the SPCA;

3.  Robertshaw, Bain Capital, Eaton Vance, and Canyon Capital did not breach any implied duty of good faith and fair dealing under New York law with respect to any matters relating to the December Transactions; and

4.  One Rock did not tortiously interfere with the SPCA under New York law; and

It is further ORDERED that Invesco may file a proof of claim on or before July 18, 2024 for any alleged monetary damages arising from Robertshaw's prepetition breach of the SPCA; and it is further

ORDERED that the Court retains jurisdiction to interpret and enforce this Order.


Signed:  June 20, 2024

Christopher Lopez
United States Bankruptcy Judge